UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| BAYSHORE RECYCLING CORPORATION,<br><br>        Plaintiff,<br><br>v.<br><br>HALLMARK SPECIALTY INSURANCE COMPANY and NFP PROPERTY & CASUALTY SERVICES, INC.,<br><br>        Defendants. | Civil Action No.: _____<br><br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff Bayshore Recycling Corporation ("Bayshore"), by and through its undersigned counsel, for its complaint against Defendants Hallmark Specialty Insurance Company ("Hallmark") and NFP Property & Casualty Services, Inc. ("NFP") (collectively, the "Defendants"), alleges and states as follows:

**NATURE OF THE ACTION**

1. This is an insurance coverage and broker malpractice action against Defendants arising out of Hallmark's breach of contract and bad faith claims handling, as well as NFP's failure to procure adequate insurance in connection with a December 16, 2019 fire at Bayshore's facility(the "Fire").

2. Bayshore's facility is a 55-acre complex in Keasbey, New Jersey, at which Bayshore engages in a number of operations, primarily involving recycling of construction materials and debris.

3. The December 16, 2019 fire severely damaged Bayshore's facility and interrupted Bayshore's operations, resulting in millions of dollars in losses.

1

4. Bayshore paid hundreds of thousands of dollars in premiums to several insurance companies for primary and excess commercial property insurance policies, covering the June 1, 2019 to June 1, 2020 policy period. Ironshore Specialty Insurance Company ("Ironshore"), Swiss Re ("Swiss"), Lexington Insurance Company ("Lexington"), and Navigators Specialty Insurance Company ("Navigators") sold Bayshore a primary policy, in which each is responsible for a portion of a shared $10,000,000 limit of liability. Bayshore's primary policies are "quota share" policies, which is a kind of property insurance policy in which risks of the policy are shared by more than one insurance company according to a predetermined percentage. Hallmark Specialty Insurance Company ("Hallmark") sold Bayshore an excess policy, in which Hallmark is responsible for a $15,000,000 limit of liability that sits atop the $10,000,00 limit under Bayshore's primary policies.

5. The policies provide "all risk" insurance coverage – that is, they provide coverage for risks except as specifically excluded. Fire loss is a "Covered Cause of Loss" under Bayshore's insurance policies, and is not otherwise excluded.

6. The policies also include business interruption coverage for loss of income sustained during the necessary partial or total interruption of Bayshore's business operations, services or production resulting from a covered cause of loss. The policies also contain a number of "Additional Time Element Coverages"; at least one of which covers Bayshore's time element losses resulting from the December 16, 2019 fire:

    a. "Extra Expense" Coverage for loss sustained by Bayshore during the period of interruption resulting from direct physical loss or damage by a covered cause of loss, including (i) extra expense incurred to "temporarily continue as nearly normal as practicable the conduct of

the Insured's business;" and (ii) extra costs "of temporarily using property or facilities of the Insured or others;" "less any value remaining at the end of the Period of Interruption for property obtained in connection with the above."

7. Bayshore gave its insurance companies timely notice of the Fire damage and sought full coverage for all loss and damage caused by the Fire. From the beginning, Bayshore informed its insurance companies it would replace the damaged property and equipment.

8. The coverage grants of the policies, coupled with the absence of any applicable exclusion, establish that the policies provide insurance coverage for Bayshore's losses stemming from the December 16, 2019 fire.

9. By April 2020 – four months after the loss, Ironshore, Swiss, Lexington, and Navigators tendered their respective policy limits to Bayshore; thus, triggering Hallmark's duty to indemnify Bayshore.

10. However, Hallmark breached its contractual obligations by failing to indemnify Bayshore for all loss and damage it suffered as a result of the fire, including for certain physical loss, extra expenses and business interruption.

11. In addition, Hallmark's continuous and willful disregard for its coverage obligations, despite admitting the existence of such obligations, amounts to a breach of its duty of good faith and fair dealing.

12. For nearly three years, Hallmark purported to investigate Bayshore's loss. Yet, during this period, Hallmark refused to advance sufficient money to allow Bayshore to finance the reconstruction project, reneged on promises regarding the cost and scope of the project,

repeatedly and arbitrarily delayed the adjustment of Bayshore's claim, and failed to pay Bayshore the entire amount owed under its policy.

13. Bayshore brings this complaint and seeks damages against Hallmark for its breach of contract and bad faith claims handling in violation of New Jersey law.

14. Bayshore also brings this complaint against NFP, Bayshore's insurance broker, due to its breaches of contract and fiduciary obligations, and its negligence in connection with brokerage services provided to Bayshore in purchasing insurance from Hallmark.

## THE PARTIES

15. Bayshore is a New Jersey company with its principal place of business in Keasbey, New Jersey.

16. Upon information and belief, Hallmark is an Oklahoma insurance company with its principal place of business in Fort Worth, Texas.

17. Upon information and belief, NFP is a Delaware company with its principal place of business in New York, New York.

## JURISDICTION AND VENUE

18. This Court has original jurisdiction over the claims set forth in this Complaint pursuant to 28 U.S.C. §1332(a)(1), as the amount in controversy exceeds $75,000.00 exclusive of interest and is between citizens of different states.

19. Venue is proper in this district pursuant to 28 U.S.C. §1391, because a substantial part of the events or omissions giving rise to this action occurred in this District, and because the Defendants engaged in substantial and not isolated activity within New Jersey.

20. Personal jurisdiction is proper in New Jersey because the Defendants operated, conducted, engaged in, or carried on a business or business venture in this state, there is the

requisite nexus between the Defendants' business and this action and because the Defendants engage in substantial and not isolated activity within New Jersey.

## FACTUAL BACKGROUND

21. On December 16, 2019, the Fire broke out at Bayshore's facility, severely damaging a number of buildings, including the main building that generates the majority of Bayshore's income. The fire also damaged various contents within those buildings, including, *inter alia*, sorting lines that separate out the recycling materials.

22. In reliance on the expertise of NFP, its insurance broker, Bayshore purchased several "all-risk" commercial property insurance policies, covering the June 1, 2019 to June 1, 2020 policy period.

23. Ironshore sold to Bayshore a commercial property primary policy, policy no. 004083800, covering the June 1, 2019 to June 1, 2020 policy period.

24. Swiss sold to Bayshore a commercial property primary policy, policy no. ESP200411800, covering the June 1, 2019 to June 1, 2020 policy period.

25. Lexington sold to Bayshore a commercial property primary policy, policy no. 011144836, covering the June 1, 2019 to June 1, 2020 policy period.

26. Navigators sold to Bayshore a commercial property primary policy, policy no. BO19HINOBF74SIC, covering the June 1, 2019 to June 1, 2020 policy period.

27. Hallmark sold to Bayshore an excess commercial property policy, policy no. 73PRX19A104, covering the June 1, 2019 to June 1, 2020 policy period.

28. Collectively, Bayshore's insurance policies have a blanket limit of $25,000,000, consisting of a $10,000,000 primary limit of liability, and a $15,000,000 excess limit of liability.

29. Bayshore's primary policies are "all risk" insurance policies, which broadly insure Bayshore "against all risks of direct physical loss or damage to Insured Property from a **Covered Covered Cause of Loss**."[1]

30. The term "**Covered Cause of Loss**" is defined in the policies as "a peril or other type of loss, not otherwise excluded."

31. The primary policies provide insurance coverage for damage to insured property, as well as for business interruption losses "sustained by the Insured during the necessary partial or total interruption of the Insured's business operations, services or production during the Period of Interruption directly resulting from a **Covered Cause of Loss** to Insured Property as an **Insured Location**."

32. Further, the primary policies contain "Additional Time Element Coverages", including for "Extra Expense", which covers "loss sustained by the Insured for **Extra Expense** during the Period of Interruption resulting from direct physical loss or damage by a **Covered Cause of Loss** to Insured Property utilized by the Insured.

33. **Extra Expense** means "reasonable and necessary:"

> Extra expense incurred to temporarily continue as nearly normal as practicable the conduct of the Insured's business; and
>
> Extra costs of temporarily using property or facilities of the Insured or others;
>
> all less any value remaining at the end of the Period of Interruption for property obtained in connection with the above.

34. The Hallmark policy follows the form of Bayshore's primary policies and provides coverage for property damage and business interruption. Coverage thereunder attaches

---

[1] Terms in bold-face print are terms that are defined in the subject insurance policies, unless stated otherwise.

upon the exhaustion of Bayshore's primary insurance policies, i.e., losses that exceed $10,000,000.

35. Bayshore gave timely notice to its insurance companies of the Fire and sought full coverage for all loss and damages stemming from it. At all times, Bayshore fully cooperated with the insurance companies' coverage investigation and otherwise complied with all conditions to coverage.

36. Immediately after the fire, it was obvious to all parties that Bayshore was entitled to the full limits of the primary policies and the Hallmark excess policy to replace the destroyed property, restore Bayshore's business operations to pre-fire conditions, and pay for business interruption loss and extra expense.

37. By April 2020, four months after the fire, Ironshore, Swiss, Lexington, and Navigators each acknowledged Bayshore's losses were covered and tendered their respective policy limits to Bayshore. However, Bayshore's losses exceed the $10,000,000 limit of liability under those policies. Indeed, Bayshore's losses exceed the $15,000,0000 limit of the Hallmark policy. Thus, Hallmark had a duty to promptly indemnify Bayshore for its fire losses in excess of $10,000,000.

38. Hallmark breached its contractual obligations by failing to indemnify Bayshore for all loss and damage it suffered as a result of the fire, including extra expenses and business interruption loss.

39. In addition, Hallmark's continuous and willful disregard for its coverage obligations, despite admitting the existence of such obligations, amounts to a breach of its duty of good faith and fair dealing.

40. At all times after the Fire, Bayshore was intent on replacing all of the damaged and destroyed property as quickly as possible, as soon as the insurance issues were resolved and Bayshore could have certainty as to what costs would be paid by Hallmark. Bayshore specifically intended to replace as soon as possible the damaged buildings and the sorting line therein, which is where construction materials and debris were triaged into elements that could be re-used or recycled. This was the most critical element of Bayshore's operations.

41. While Ironshore, Swiss, Lexington, and Navigators all tendered their respective limits to Bayshore by April 2020, Hallmark repeatedly delayed the investigation, processing and payment of Bayshore's claim, despite its knowledge or reckless disregard of the fact that no valid reasons supported those delays.

42. As an example, Hallmark did not make any payments to Bayshore until August 28, 2020, more than eight months after the fire. Even then, Hallmark only paid Bayshore $952,857, claiming the payment was an advance for the actual cash value of the damaged property. That amount was dramatically lower than any good-faith realistic estimate. Hallmark's estimate deducted a clearly unreasonable depreciation of Bayshore's building, despite the fact that the building was made of steel and concrete. This unreasonable deduction was specifically designed to, and did, result in a woefully inadequate partial payment by Hallmark, which was insufficient to allow Bayshore to finance the replacement of its building.

43. Bayshore informed Hallmark that delays in replacement of its buildings and sorting lines would harm its business and affect its customer base. Despite these warnings, Hallmark had no intention of promptly paying Bayshore's claim. Nor did Hallmark have any intention of honoring its coverage obligations.

44. Throughout 2020, 2021 and 2022, Bayshore pressed Hallmark to resolve Bayshore's claim. Bayshore hired an adjuster, National Fire Adjustment Co., Inc. ("NFA"), to facilitate a fair and prompt resolution of Bayshore's claim. NFA regularly communicated with Hallmark, scheduled joint inspections and meetings, and provided ample support to Hallmark regarding the scope and cost of work to restore Bayshore's facility to its pre-fire condition. NFA also provided ample support to Hallmark regarding Bayshore's business interruption and extra expense losses.

45. Throughout its claim investigation, Hallmark repeatedly failed to respond to NFA – in some cases, for weeks or months at a time. Hallmark's failure to respond to NFA caused significant and unjustifiable delays and, as a consequence, Bayshore suffered additional business interruption loss.

46. Throughout its claim investigation, Hallmark ignored the facts and deliberately made unreasonably low offers, which combined with its delay tactics, were designed to wear Bayshore down into accepting an unreasonably low settlement of the claim.

47. Following a joint inspection of Bayshore's facility, at which Hallmark and Bayshore agreed upon the scope and cost of certain work, Hallmark reneged on those agreements and refused to adjust its estimate. This conduct was a pattern and practice throughout Hallmark's claim investigation.

48. By mid-2022, Hallmark had advanced Bayshore only $2,550,315. This amount did not include coverage for contents or business interruption. In fact, Hallmark did not even address Bayshore's business interruption losses until the end of 2021, and did not pay any of Bayshore's business interruption losses until November 10, 2022 – almost three years after the loss.

docs-100598573.8

49. Initially, Hallmark estimated that Bayshore's business interruption losses were only $395,000, while NFA estimated Bayshore's business interruption losses were $7,484,754.

50. After several months of back-and-forth communications, Hallmark finally acknowledged its error, and increased its estimate of Bayshore's business interruption losses to $2,849,348. However, Hallmark only paid $2,5000,000 of Bayshore's business interruption losses, based on its proffered interpretation of the policy limit, which is significantly less than Bayshore's actual loss.

51. To date, Hallmark has refused to pay the entirety of Bayshore's claim in breach of the Hallmark policy. Hallmark has failed to deal fairly and in good faith with Bayshore in its refusal to pay the entirety of Bayshore's claim as prescribed by the Hallmark policy, despite repeated claims, requests and demands. Despite having no reasonably debatable basis for refusing to pay Bayshore's claim in accordance with the Hallmark policy, and knowingly, willfully, or recklessly disregarding that it had no debatable basis for refusing to pay Bayshore's claim, Hallmark has still yet to pay Bayshore's entire claim.

52. Hallmark breached its duty of good faith and fair dealing by unreasonably and unfairly delaying payment of Bayshore's claim for more than three years, and only offering to pay a fraction of Bayshore's claim.

53. Hallmark contends it only owes Bayshore $2,500,000 in lost income stemming from damage to Bayshore's main building because the statement of values, provided by NFP, limits business interruption coverage to $2,500,000 in connection with that building.

54. To the extent Hallmark is correct, and Bayshore's business interruption coverage is capped at $2,500,000, NFP is liable to Bayshore for broker malpractice because NFP

neglected to procure adequate insurance, secured a policy that is materially deficient, and the Hallmark policy does not provide the coverage NFP undertook to supply to Bayshore.

55. On May 13, 2019, Bayshore entered into a written services contract with NFP and appointed NFP its insurance broker with respect to negotiation and placement of insurance on Bayshore's behalf for its commercial property insurance program.

56. NFP, however, was not just an ordinary insurance broker. Indeed, NFP served as Bayshore's risk manager, providing risk management assessment, risk management programs, and coverage gaps analysis.

57. Since 2019, Bayshore relied upon NFP to provide comprehensive risk management and brokerage services.

58. Given NFP's relationship with Bayshore, NFP was well aware of Bayshore's business activities and risks.

59. NFP ultimately placed Bayshore's commercial property coverage with, among others, Hallmark.

60. Hallmark contends that the business interruption coverage is limited to $2,500,000 because the statement of values NFP submitted to Hallmark on Bayshore's behalf states that value for the main building at the site, which was largely destroyed by the fire. Indeed, Hallmark contends that although Bayshore's facility has a blanket business interruption coverage limit of $5,000,000, the business interruption coverage limit for certain buildings at Bayshore's facility is capped at an amount far less than the actual blanket limit provided under the policy.

61. NFP committed to Bayshore, under the Broker Agreement and otherwise, to provide full and appropriate coverage for Bayshore's commercial property risks.

62. To the extent the Hallmark policy caps Bayshore's business interruption losses at $2,500,000 in connection with the fire damage to its main building, NFP failed to secure adequate coverage for Bayshore – namely, because NFP failed to submit an accurate statement of values, reflecting the true business income generated by Bayshore's main building.

63. As a direct and proximate result of the foregoing, Bayshore has incurred substantial actual damages and such damages are continuing.

## COUNT I
### (BREACH OF CONTRACT AGAINST HALLMARK)

64. Bayshore repeats and re-alleges each and every allegation contained in the foregoing paragraphs of the Complaint as if fully set forth herein.

65. The Hallmark policy constitutes a valid and enforceable contract that imposes upon Hallmark certain obligations, including the obligation to indemnify Bayshore for all loss and damage stemming from the Fire.

66. Notwithstanding this obligation, Hallmark, by refusing to honor its coverage obligations owed to Bayshore, has violated its contractual obligations owed to Bayshore in breach of the Hallmark policy.

67. Bayshore has satisfied all obligations owing under the Hallmark policy and has complied with all conditions necessary for coverage under the policy, including, but not limited to, paying all insurance premiums due for the policy.

68. Hallmark's breaches, actions, and conduct described above constitute a breach of contract.

69. As a direct and proximate result of Hallmark's breach of contract, Bayshore incurred and continues to incur damages, including, but not limited to, compensatory damages,

direct and consequential damages, pre- and post-judgment interest, and costs in an amount to be proven at trial.

## COUNT II
## (BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST HALLMARK)

70. Bayshore repeats and re-alleges the allegations set forth in the foregoing paragraphs of the Complaint as if fully set forth herein.

71. The Hallmark policy is a valid and enforceable insurance contract between Hallmark and Bayshore.

72. There is an implied covenant of good faith and fair dealing in every contract.

73. Hallmark has failed to deal fairly and in good faith with Bayshore in its failure and refusal to indemnify Bayshore for all loss and damages it suffered as result of the December 16, 2019 fire, despite repeated claims, requests and demands to do so.

74. Specifically, despite having (i) no reasonably debatable basis for refusing to indemnify all of Bayshore's loss and damages stemming from the December 16, 2019 fire in accordance with the Hallmark policy, and (ii) knowingly, willfully or recklessly disregarding that it had no debatable basis for refusing to indemnify Bayshore, Hallmark has still yet to fully indemnify Bayshore.

75. Hallmark has further failed to deal fairly and in good faith with Bayshore by inexcusably delaying payment of Bayshore's coverage claim for almost three years, during which time Bayshore was significantly prejudiced.

76. Hallmark further breached its duty of good faith and fair dealing by unreasonably and unfairly offering to pay only a fraction of Bayshore's claim, and unilaterally discounting certain costs incurred by Bayshore.

docs-100598573.8

77.  As a result of Hallmark's willful breaches of its implied covenant of good faith and fair dealing with Bayshore, Bayshore has sustained and may in the future sustain damages, and is entitled to an aware of compensatory damages, direct and consequential damages, punitive damages, pre- and post-judgment interest, attorneys' fees, and costs in an amount to be proven at trial.

## COUNT III
## (BREACH OF CONTRACT AGAINST NFP)

78.  Bayshore repeats and re-alleges the allegations set forth in the foregoing paragraphs of the Complaint as if fully set forth herein.

79.  The brokerage agreement between NFP and Bayshore constitutes a valid and enforceable contract.

80.  Under the brokerage agreement, NFP agreed to provide brokerage services to Bayshore.

81.  If Hallmark is correct that the business interruption limit of the policy is $2,500,000, then NFP failed to procure adequate coverage for Bayshore – namely, because the business interruption coverage limit is incorrect, rendering the policy materially deficient.  In any event, NFP should have caught this error in the policy, if it is in fact an error.  Thus, NFP did not perform all of its duties consistent with the terms and conditions of its brokerage agreement with Bayshore.

82.  By reason of the foregoing, NFP has breached the broker agreement with Bayshore by failing, among other things, to secure adequate coverage for Bayshore in connection with the loss and damages Bayshore suffered as a result of the Fire.

83.  As a result of the aforesaid breaches of contract, Bayshore has suffered damages in an amount to be proven at trial.

docs-100598573.8

## COUNT IV
## (NEGLIGENCE AGAINST NFP)

84. Bayshore repeats and re-alleges the allegations contained in the foregoing paragraphs of the Complaint as if fully set forth herein.

85. At all relevant times, NFP owed Bayshore a duty to exercise reasonable skill, care, and diligence when, among other things: (i) advising Bayshore in the purchase of the Hallmark policy; (ii) procuring the Hallmark policy on Bayshore's behalf; and (iii) examining the proposed terms and conditions of the Hallmark policy and ensuring the Hallmark policy met Bayshore's needs.

86. If Hallmark is correct and the business interruption limit is $2,500,000, then NFP breached its duties to Bayshore and failed to exercise reasonable skill, care, and diligence in connection with the brokerage services it provided to Bayshore by, *inter alia*, failing to secure adequate coverage under the Hallmark policy for Bayshore's loss and damages stemming from the Fire.

87. As a result of NFP's breaches of its duties owed to Bayshore, Bayshore has sustained significant damages.

88. NFP's negligence has actually and proximately caused damage to Bayshore in an amount to be proven at trial.

## COUNT V
## (BREACH OF FIDUCIARY DUTY AGAINST NFP)

89. Bayshore repeats and re-alleges the allegations set forth in the foregoing paragraphs of the Complaint as if fully set forth herein.

90. In New Jersey, insurance brokers are required to act in a fiduciary capacity to their client because of the increasing complexity of the insurance industry and the specialized knowledge required to understand its intricacies.

91. The detection of deficiencies in material coverage provisions, including those that are buried within the policy, required the specialized knowledge and training of NFP, upon which Bayshore relied.

92. The nature of the relationship between Bayshore and NFP was one of trust and confidence.

93. NFP assumed the task of discerning and addressing deficiencies in coverage under the Hallmark policy, and Bayshore relied on NFP.

94. In failing to perceive and address certain deficiencies in the Hallmark policy, including the potential limitation on business interruption coverage in connection with Bayshore's main building that was damaged by fire and generates approximately 95% of Bayshore's income, NFP breached its fiduciary duty to Bayshore, and caused harm to Bayshore.

95. As a result, Bayshore has sustained injury proximately caused by NFP.

## COUNT VI
## (PROFESSIONAL MALPRACTICE AGAINST NFP)

96. Bayshore repeats and re-alleges the allegations in the foregoing paragraphs of the Complaint as if fully set forth herein.

97. NFP owed a professional duty to Bayshore to perform as Bayshore's insurance agent and broker and to professionally provide those services with the degree of skill, care and diligence generally expected of reasonably skilled members of the profession.

98. Bayshore reasonably relied upon NFP to act in a manner consistent with the standard of care for an insurance agent and broker.

99. Bayshore specifically relied upon NFP to ensure that Bayshore did not have any deficiencies in the Hallmark policy.

docs-100598573.8

100. NFP departed from the standard of care expected of members of its profession in procuring and reviewing Bayshore's insurance coverage under the Hallmark policy.

101. NFP violated its professional duty of care owed to Bayshore.

102. As a direct and proximate result of NFP's professional malpractice, Bayshore has sustained damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Bayshore hereby demands judgment against Hallmark and NFP as follows:

1. With respect to Count I,

    (a) awarding money damages, pre-judgment and post-judgment interest;

    (b) requiring Hallmark to (i) pay all costs arising out of its breaches of the Hallmark policy; and (ii) indemnify Bayshore for all loss and damages sustained as a result of the December 16, 2019 fire;

    (c) for costs of suit (including attorneys' fees); and

    (d) for such other and further relief as the Court may deem just and proper.

2. With respect to Count II,

    (a) awarding money damages, pre-judgment and post-judgment interest;

    (b) declaring that Hallmark's failure to provide insurance coverage to Bayshore for all loss and damages it suffered as a result of the December 16, 2019 fire is in contravention of Hallmark's duty of good faith and fair dealing;

    (c) for actual damages in an amount to be proven at trial; and

    (d) for costs of suit (including attorneys' fees); and

    (e) for such other and further relief as the Court may deem just and proper.

3. With respect to Counts III, IV, V, and VI,

(a)     Judgment against NFP for breach of contract, negligence, breach of fiduciary duty, and professional malpractice;

(b)     Compensatory, direct and consequential damages in an amount to be determined at trial;

(c)     for actual damages in an amount to be proven at trial; and

(d)     Pre- and post-judgment interest, and costs of suit (including attorneys' fees); and

(e)     for such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Bayshore hereby demands a trial by jury as to all Causes of Action so triable.

Dated:   Newark, New Jersey
          June 2, 2023

ANDERSON KILL P.C.

By:   */s/ John P. Lacey Jr.*

John P. Lacey, Jr., Esq.
Finley Harckham, Esq.
(*Pro Hac Vice Forthcoming*)

One Gateway Center, Suite 1510
Newark, New Jersey 07102
Telephone: (973) 642-5858
Facsimile: (973) 621-6361

*Attorneys for Plaintiff*
*Bayshore Recycling Corporation*