# EXHIBIT B

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION, CIVIL PART
MIDDLESEX COUNTY
DOCKET NO. L-6483-13
A.D.#_____

1

2    WAKEFERN FOOD CORP., ET AL.,    )
                                     )
3                   Plaintiff,       )
                                     )          TRANSCRIPT
4                                    )              OF
             vs.                     )          MOTIONS FOR
5                                    )        SUMMARY JUDGMENT
     LEXINGTON INSURANCE             )
6    COMPANY, ET AL.,                )
                                     )
7                   Defendant.       )

8

9                        Place:   Middlesex County Courthouse
                                  56 Paterson Street
10                                New Brunswick, New Jersey 08903

11                       Date:    June 28, 2018

12

13   BEFORE:

14     HONORABLE MELVIN L. GELADE, J.S.C.

15   TRANSCRIPT ORDERED BY:

16     SHERILYN PASTOR, ESQ. (McCarter & English)

17

18

19

20

21

22                       Transcriber, Sherry M. Bachmann
23                       G&L TRANSCRIPTION OF NJ
                         40 Evans Place
24                       Pompton Plains, New Jersey 07444

25                       Sound Recorded
                         Recording Operator,

```
 1   APPEARANCES:

 2     SHERILYN PASTOR, ESQ.
       (McCarter & English)
 3     Attorney for the Plaintiff

 4
       WILLIAM D. WILSON, ESQ.
 5     WAYNE R. GLAUBINGER, ESQ.
       (Mound Cotton Wollan & Greengrass)
 6     Attorneys for the Defendant, Lexington

 7     VAL E. WAMSER, ESQ.
       (Nicoletti Hornig & Sweeney)
 8     Attorney for the Defendant, BWD Group

 9
       JOSEPH D. DEAL, ESQ.
10     PATRICIA M. HENRICH, ESQ.
       (Reilly, McDevitt & Henrich)
11     Attorneys for the Defendant, Associated Agencies

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                              I N D E X

2

3    PROCEEDING                                              PAGE

4

5    Motions for Summary Judgment                             4
                                                             28
6                                                            37

7

8    Judge's Decision                                         24
                                                             35
9                                                            71

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

 1              THE COURT:  Please be seated, everyone.  Good

 2   morning.

 3              MS. PASTOR:  Good morning.

 4              MS. HENRICH:  Good morning, Your Honor.

 5              THE COURT:  I'm Judge Gelade, and this is the

 6   matter of <u>WAKEFERN</u> -- I'm sorry -- <u>WAKEFERN FOOD CORP.</u>

 7   <u>V. LEXINGTON INSURANCE, ASSOCIATION AGENCIES, AND BWD</u>

 8   <u>GROUP</u>, docket number L-6483-13.  So, first, I'll take

 9   appearances of Counsel for Wakefern.

10              MS. PASTOR:  Good morning, Your Honor.  I'm

11   Sheri Pastor from McCarter & English and I represent

12   Wakefern Food Corporation and its members.

13              THE COURT:  Thank you.  And for Lexington

14   Insurance?

15              MR. WILSON:  Good morning, Your Honor.

16   William Wilson and Wayne Glaubinger from Mound Cotton

17   on behalf of defendant, Lexington.

18              THE COURT:  Okay.  For Associated Agencies?

19              MR. DEAL:  Good morning, Your Honor.  Joseph

20   Deal and Patricia Henrich from Reilly, McDevitt &

21   Henrich, on behalf of the Associated Agencies, Inc.

22              THE COURT:  Okay.  And, finally, BWD?

23              MR. WAMSER:  Good morning, Your Honor.  Val

24   Wamser from Nicoletti Hornig & Sweeney, representing

25   the defendant, BWD Group.

5

1          THE COURT:  Okay.  Okay.  There are several

2     motions and cross-motions on today.  So we'll start

3     with Lexington's motion for summary judgment seeking to

4     dismiss plaintiff's breach of contract, declaratory

5     judgment, and breach of duty of good faith and fair

6     dealing claims and plaintiff's cross-motion for summary

7     judgment or for a declaratory judgment that Lexington's

8     policies, business loss due consideration provision

9     does not permit a 500,000 credit for actual profits

10    made up posting direction.  That's -- those are the

11    two.  So that will be Ms. Pastor and Mr. Wilson?

12         MR. WILSON:  Yes, Your Honor.

13         THE COURT:  Okay.  As I understand it, --

14    now, I want the record to reflect that I was assigned

15    this case because of a conflict of the Judge who

16    actually heard oral argument on the motions, Judge

17    Brady.  After I was assigned the case, I had extensive

18    conversation with Judge Brady.  She prepared memos.

19    I'm familiar with all of the arguments made by all

20    parties in the matter.

21         I have -- I have read all the relevant case

22    law, all the relevant documents.  I've gone through the

23    entire file, not word for word.  That's for the jury,

24    not for me, but I've certainly familiarized myself with

25    what's going on.

6

1          Lexington has -- is the insurer and Wakefern
2     is the insured.  Wakefern -- we normally think of the
3     ShopRites as a chain.  It's not really.  It's more of a
4     hybrid.  There are some ShopRites that are owned --
5     there are numbers of ShopRites, which are owned by
6     single entities, such as the one that's in my
7     neighborhood is Saker.  Saker ShopRite owns a lot of
8     them.  There are a lot of individual stores.
9          So Wakefern is the -- I'll call it the
10    umbrella entity for all of the ShopRites, which were
11    involved in this proceeding and, among other things,
12    the Lexington covered casualty insurance, property
13    damages, and the like, in this case, due to a named
14    store, Hurricane or Tropical Storm Sandy.  We never --
15    I never really understood the difference between a
16    hurricane or not a hurricane but, in any event, it's a
17    named storm.
18         There doesn't seem to be any dispute about
19    that, and there isn't much dispute that there were a
20    number of stores that were extensively damaged and that
21    they suffered losses and spoliation of food and the
22    like and sought recovery, and there were several
23    issues.
24         The other motion has to do with a different
25    issue.  But, in this particular motion, the Lexington

7

 1   is claiming that there really is -- is no need to

 2   determine whether or not the policy covered everything.

 3   What they're saying is that there was -- after the loss

 4   had occurred, the company -- those particular stores

 5   that were damaged actually made up part of the losses

 6   that Lexington said they covered and, therefore, they

 7   should get a credit in this case of $500,000.

 8         There were several motions in the matter

 9   before these motions were filed and they had to do

10   primarily with, number one, what was the value, the

11   amount of the deductible under the policies, which was

12   a two percent -- and I'm going to -- you know, I keep

13   -- I keep saying -- the true -- let's see -- total

14   insurance value, the TIV.  That's really on the other

15   motion, but that was an issue.  Judge Francis found

16   that the deductible was the two percent of the total

17   insured value and there were appraisers appointed by

18   both sides and, eventually, an amount of money came

19   into play on that.

20         Lexington had allegedly withheld payment of

21   much of the loss while all of that was going on and,

22   eventually, the deductible was fixed and I think it was

23   somewhere around $23 million and that deductible was --

24   well, after that deductible was taken into account,

25   Lexington paid what it considered to be the amount of

8

1    the claim, less, in this case, $500,000 for made up

2    post-interruption profits.

3            And the -- so the question that I understand

4    is before me in this case is on that issue, whether or

5    not post-interruption earnings, profits, whatever, can

6    be taken into consideration under the policy.  Also,

7    plaintiffs claim that there were -- that after the

8    claimed losses were fixed at an amount above the $23

9    million, the -- there was also spoilage claims

10   outstanding and they ultimately were paid, I think, in

11   the amount of $4.7 million.  The claim was $5.6

12   million.  So there are various issues.

13           So the first issue is, does a material fact

14   exist precluding the dismissal of plaintiff's breach of

15   contract claim because Lexington withheld the credit or

16   whatever?  And the applicable language in Lexington's

17   policy is the company shall be liable subject to all

18   other conditions of this policy, not inconsistent

19   herewith, for the actual loss sustained of the

20   following during the period of interruption.  One,

21   gross earnings, less all charges and expenses that do

22   not necessarily continue during the interruption of

23   production or suspension of business operations or

24   services and the parties are at odds over what --

25   whether or not they can -- the defendant can prevent

MID L 006483-13   01/02/2019   Pg 11 of 84 Trans ID: LCV201950656
Case 1:23-cv-19847-KMW-AMD   Document 38-2   Filed 01/04/23   Page 10 of 83 PageID: 194
335

9

```
 1    what it calls an unjust enrichment based on the
 2    following.
 3              In determining the amount of loss payable
 4    under this coverage, due consideration shall be given
 5    to the experience of the business before the period of
 6    interruption and the probable experience thereafter had
 7    no loss occurred and to the continuation of only those
 8    normal charges and expenses that would have existed had
 9    no interruption of production or suspension of business
10    operations or services occurred.
11              And Lexington cites primarily -- and I've got
12    a lot of paperwork here, so I'm not going to be as fast
13    as normally would be expected.  But on -- I thought I
14    had these two motions.  There's five, but let's see.
15    Okay.  Here we are.  So Lexington cites to ELBERON
16    BATHING COMPANY V. THE AMBASSADOR INSURANCE, 77 New
17    Jersey 1, which it alleges stands for the proposition
18    that the plaintiff cannot receive a double recovery for
19    profits that it made up after its business operation.
20              Defendants cite -- take issue with the
21    plaintiff's interpretation -- I'm sorry -- with the
22    defendant's interpretation of the holding of the Court
23    in that case and distinguish it because it was a fire
24    loss and was governed by statute, not a casualty loss
25    of this type.  But more important, plaintiffs cite to
```

1   two Fifth Circuit cases, which were diversity cases,

2   FINGER FURNITURE COMPANY, INC. V. COMMONWEALTH

3   INSURANCE and 404 F.3d 312, which was a 2005 matter and

4   it arose out of the -- an appeal from the United States

5   District Court for the District of Texas.

6        Second was CATLIN SYNDICATE V. IMPERIAL

7   PALACE OF MISSISSIPPI, 600 F.3d 511, a 2010 decision in

8   the Fifth Circuit out of the Mississippi District -- so

9   -- District of Mississippi Court.  And, there,

10  plaintiff contends that under the -- the policy is very

11  similar to this.  The Court -- the Fifth Circuit's

12  reasoning would also apply to the reasoning of our

13  Courts in published decisions to confine the decision

14  -- the decision on interpretation of the policy to the

15  actual language of the policy.

16       So I'll hear -- since this is on this issue

17  -- this is plaintiff's cross-motion, I'll hear from

18  plaintiff.

19       MS. PASTOR:  Thank you, Your Honor, and thank

20  you for taking the time that you took to become

21  familiar with the filing.  I know the magnitude of the

22  paper and know that the oral argument you listened to

23  would have been over two hours, so I appreciate that.

24       THE COURT:  It's -- well, again, I want to

25  make clear, as I said, I asked my law clerk to inform

1  the parties of this hearing and tell everyone that I

2  don't have any time constraints and I don't -- it isn't

3  necessary to reargue the entire oral argument that was

4  done before.  However, that doesn't mean that I'm going

5  to abridge anybody's arguments.  I assume you're all

6  fine attorneys.  Your briefs show that you are skilled

7  in the standard of excellence, so you're not going to

8  reargue everything, but I'm certainly not going to

9  limit you.  You can tell me whatever you think is

10  necessary for me to hear to represent your clients.

11            MS. PASTOR:  Thank you, Your Honor.

12            THE COURT:  Ms. Pastor?

13            MS. PASTOR:  On Wakefern's motion, Wakefern's

14  motion is very narrow.  It's limited to makeup and what

15  the Lexington insurance policy allows and provides and

16  that is, in part, because going beyond that, we believe

17  there would otherwise be fact questions, so I'm going

18  to come back to that.

19            The Lexington policy provides coverage for

20  business interruption.  It looks at the period of

21  interruption and the policy calls for calculating

22  Wakefern's gross earnings and its loss sustained during

23  that period.  In doing that, the policy is very

24  specific about how Lexington calculates those gross

25  earnings and it expressly says that it's going to pay

MID L 006483-13    01/02/2019    Pg 14 of 84 Trans ID: LCV201950656
Case 2:23-cv-19047-KM-JBC   Document 38-2   Filed 01/04/23   Page 13 of 83 Page 197
338

12

1 the total net sales, less the cost of merchandise.  It

2 doesn't say less the cost of anything else.

3   It also goes onto say that, in addition to

4 paying those total net sales, it's going to pay all

5 other lost earnings.  Again, this is talking about what

6 Wakefern has in coverage and what Wakefern is paid and

7 there's nothing in that provision that reduces that

8 amount.

9   Now, what -- in looking at those items, in

10 calculating, the policy says, you look to two things.

11 One is the actual experience before, which you would

12 have had because the stores would have been open and

13 they would have actual experience and what you look

14 then is at the probable thereafter.

15   Lexington focuses on the word thereafter as

16 if it gives it carte blanche to look at anything it

17 wants.  The word probable is important and must be

18 given meaning.  And why do I say probable?  Because

19 probable is predicting when the stores are closed, what

20 they would have done in business.  If it were actual

21 thereafter, that would be looking at what Wakefern did

22 when it reopened the stores and was able to make sales.

23   There is nothing in the policy that says,

24 Lexington can look at arbitrarily some stores, not all

25 stores, and then seven days for those stores.  There is

13

1    nothing that says seven days, ten days.  It doesn't

2    allow that process at all.

3         And this issue was before the Court and Judge

4    Francis specifically in 2016 because Lexington made a

5    motion to dismiss the makeup claim and, in the Court's

6    July 15, 2016, decision at Page 15, the Court offers

7    its analysis of makeup and specifically says, only

8    historical sales figures shall be considered when

9    determining loss and sales figures after reopening

10   should not be taken into account and the Court quotes

11   from and cites to CATLIN SYNDICATES, the Fifth Circuit

12   case Your Honor just mentioned.

13        So this Court has already determined, albeit

14   when considering a motion to dismiss makeup on bad

15   faith, which is stayed, but no different than the

16   contract issue that is before the Court that what it

17   ought to be considering is historical sales figures and

18   not doing what Lexington is doing, which is saying,

19   when the lights turned on and you, Wakefern, were not

20   entitled to anymore money, we're going to see what you

21   made anyway and reduce that from what you lost while

22   the lights were out.

23        And, in fact, to go beyond that as Lexington

24   asks, what the Court found was there remains a factual

25   dispute, whether makeup was included in the policy and

MID L 006483-13    01/02/2019    Pg 16 of 84 Trans ID: LCV201950656
Case 1:23-cv-10847-KMW-JBD    Document 38-2    Filed 01/04/23    Page 15 of 83 PageID 199
340

14

1    if Lexington wrongfully took a makeup credit.  Why is

2    that important?  Because the flip side, asking for

3    $500,000 in makeup doesn't work, didn't work then,

4    doesn't work now.  Why doesn't it work?  Because even

5    though after the named storm decision was rendered by

6    the Court, Lexington declined to pay.  It asked instead

7    for appraisal and the parties were sent out for

8    appraisal.

9            The mediator -- or the appraisers were asked

10   to value makeup, not to decide as a matter of law

11   whether either party was entitled to it or not entitled

12   to it and what they found was -- and their award is

13   important -- they used the word gross amount.  The

14   gross amount of makeup is $500,000 and why?  That's

15   because Lexington tried to offer two arguments to the

16   appraisers.

17           One was an argument about the policy, which

18   it declined to rule on and directed in its award that

19   that was deferred to the Court for resolution but then

20   it also brought up arguments about, well, you can't

21   have a windfall, you can't make money twice.  Well, if

22   we get to that second part and that's not what

23   Wakefern's motion is about, then there are questions of

24   fact because Lexington did not pay all amounts.  This

25   makeup comes from things that it declined to pay, so

MID L 006483-13     01/02/2019     Pg 17 of 84 Trans ID: LCV201950656
Case 2:23-cv-03047-KMS-AMD   Document 39-3   Filed 01/04/23 Page 16 of 83 PageID00
341

15

1    let me give the Court an example.

2              The lights go back on, the power comes on,

3    and now a cashier can start ringing up products if the

4    store opens.  It was Lexington's view that if we had to

5    pay the salaries for people during the time the store

6    was out and have people who were what they called idle

7    there, so that they could start ringing up products, so

8    that they could start cutting meat for the deli

9    counter, that that wasn't covered and they weren't

10   paying for it.

11             So there were hundreds of thousands of

12   dollars not paid to Wakefern under this policy because,

13   according to Lexington, that's not what's included in

14   its policy.  Yet, it takes advantage of it by trying to

15   say that the policy allows it to look after and see

16   whether we were making any money after business

17   interruption ended.

18             It is Wakefern's position as the policy

19   provides that it does not permit makeup.  It doesn't

20   have the words makeup in it.  The only place they were

21   able to find those words were in a provision relating

22   to makeup production, which is what this isn't,

23   Wakefern is a manufacturer, but more importantly, its

24   witnesses were deposed and they didn't say, yes, you'll

25   find that in 3C, just turn to Page 2.  What they said

MID L 006483-13     01/02/2019     Pg 18 of 84 Trans ID: LCV201950656
Case 2:23-cv-09047-KMS-ABD   Document 139-3   Filed 01/24/23   Page 17 of 83 PageID 01
342

16

1  is, oh, it's a little bit more complex.  You would have

2  to put together provisions, we can't point you to

3  something specific.  This was their corporate rep.

4         Instead, you would have to look at the

5  theories of double recovery and theories of indemnity.

6  All of those things, though, are outside the policy and

7  what they have not been able to point to the Court

8  because it's not in there is a provision that says,

9  after the business interruption ends, Lexington can

10  look at those stores it regards as having made up

11  losses for a seven-day period and take the credit for

12  it.

13         On that basis, Your Honor, it is our view

14  that summary judgment is appropriate on this

15  interpretation of the policy and after we -- I will

16  reserve all other arguments on the Lexington issues

17  until we get to their motion.

18         THE COURT:  Thank you.

19         MS. PASTOR:  Thank you.

20         THE COURT:  Okay.  Mr. Wilson?

21         MR. WILSON:  Thank you, Your Honor, and

22  welcome to this case.  It's been around for a long

23  time.  Ms. Pastor raised a number of different

24  arguments during her oral argument, things such as

25  payroll coverage, other things.  Those are not before

1  the Court.  Those are not issues.  They didn't purchase

2  different types of coverage that they wished they did

3  and, now, they're trying to reargue that.  But that's

4  not what's before the Court.

5          What's before the Court is, can Lexington

6  take a credit for makeup?  Now, Your Honor, there is no

7  question that Wakefern made up sales after the loss.

8  The appraisers found that and what the appraiser said

9  is Lexington claimed it was much more than 500,000.

10  Wakefern claimed it was zero.  The appraisers who have

11  accounting and legal background sat down.  What did

12  they look at, Your Honor?  They looked at the

13  historical sales and they said, well, after the period

14  of interruption, Wakefern made $500,000 more than it

15  would have had it not been for the loss.  So, clearly,

16  there was $500,000 in makeup and that's what the

17  appraisal award says.

18          Now, Ms. Pastor says that it -- well, you

19  have to -- it says, gross.  It means, it could be up to

20  500,000.  That's not what they said.  What the

21  appraiser said is if you don't take into account

22  makeup, you get paid 4.7 million.  If you take into

23  account makeup, you get 4.2.  It's a gross number.  You

24  either subtract it or you don't.

25          There is no 400,000 worth makeup, 300,000,

1    200,000.  It's 500,000 and the appraisers that the

2    parties selected agreed to that.  Now, this is not a

3    forced award by a mediator.  The parties got together,

4    the --

5          THE COURT:  Excuse me.  This is a contract

6    interpretation and what the appraisers do is not

7    binding on the Court.  This is an interpretation of the

8    contract.  This is -- assuming they did that, what --

9    what is the basis for their being permitted to do that?

10         MR. WILSON:  Exactly, Your Honor.  So the

11    reason that I started with that is to say --

12         THE COURT:  I'm sorry.

13         MR. WILSON:  -- to get rid of any confusion

14    that there was or wasn't makeup.  You knew there was

15    makeup.  The question is, do you get a credit and

16    that's where you go to the policy.  And what we would

17    say, Your Honor, is the policy says you look at the

18    actual loss sustained.  What is the actual loss

19    sustained?

20         So you look at the provision, which you read

21    and it says, due consideration shall be given to

22    certain things and it says, in determining the amount

23    of loss payable under this coverage, due consideration.

24    Now, what is due consideration?  It's not an exact

25    phrase.  Typically, what you do is you have

MID L 006483-13    01/02/2019    Pg 21 of 84 Trans ID: LCV201950656
Case 2:23-cv-19304-KMS-AMD    Document 139-3    Filed 01/24/23    Page 20 of 83 PageID 04
345

19

1    accountants, you have experts.  They go in there and

2    they look at the documents.

3            And what do they consider?  It says, due

4    consideration shall be given to the experience of the

5    business before the period of interruption.  Well,

6    that's based on actual amounts because you knew what

7    you sold prior to the period of interruption.  But then

8    it says, and the probable experience.  Now, what is the

9    probable experience?  That's based on historical sales

10   and Ms. Pastor has admitted, you look at historical

11   sales.  She says, oh, but then you ignore actual.  But

12   it says right here, you have to look at the probable

13   experience thereafter and thereafter is after the

14   period of interruption.

15           So what do I do, Your Honor, and this is an

16   example I used last time and I don't want to repeat

17   myself but just because, if I look prior to the period

18   of interruption, I would have sold -- I sold $10.

19   That's actual.  I sold $10 before the storm.  During

20   the period of interruption, I sold zero.  Well, how do

21   I determine a loss?  Well, I have to figure it based on

22   historical sales.  What would I have sold during that

23   period?  And because these are supermarkets, they track

24   their sales down to the penny.  They know exactly what

25   they're going to sell.

1          So say they determine, well, during the

2     period of interruption, I would have sold $10.  So Ms.

3     Pastor says, stop right there.  You have a $10 loss.

4     But I look at the policy and it says, and the probable

5     experience thereafter had no loss occurred.  So I don't

6     stop at the period of interruption.  I have to look

7     beyond the period.  I have to look thereafter.

8          So I look at the sales and I say, well, how

9     do I determine the probable experience thereafter?

10    Well, I look at historical sales and during that

11    period, I would have earned $10.  So I looked before

12    the storm, I had $10, during the storm, I would have

13    earned $10 but I got zero, and after the storm, the

14    period thereafter, I should have earned $10.  But as it

15    turns out, I earned $15.

16         So, now, if I look at the period before, the

17    period during, and the period after, as the policy

18    says, I have a total sales of $25.  I would have earned

19    $30 based on historical experience and, now, I have a

20    $5 loss.  I don't have a $10 loss because I considered

21    the period thereafter.

22         And in an insurance policy, every single word

23    has to have meaning.  If you read Wakefern's briefs,

24    they changed the word thereafter to during and why is

25    that important?  Because when you look at the Fifth

MID L 006483-13    01/02/2019    Pg 23 of 84 Trans ID: LCV201950656
Case 2:23-cv-09047-JMS-AMD    Document 139-3    Filed 01/04/23  Page 22 of 83 PageID 06
347

21

1   Circuit cases, they didn't use the word thereafter.

2   The language changed and what happened is insurance

3   companies often modify language follow court decisions.

4   So you can't look at FINGER FURNITURE or CATLIN

5   SYNDICATES because they didn't have the word

6   thereafter.  So what we have to look at is the policy

7   that we have before us, not the policy another Court

8   had before them or not the policy Wakefern wanted.

9        So our position here is that you have to give

10  thereafter meaning and how else can you give it meaning

11  other than to look at what the sales were because, if

12  you look at the probable experience thereafter, what

13  would you have earned thereafter?  Ms. Pastor said,

14  well, you look at what you would have earned and then

15  you ignore it.  But that's not giving it due

16  consideration.  In order to give it due consideration,

17  you have to say, well, what would I have earned, what

18  did I earn, I have to look at the period before, I have

19  to look at the period during.

20       So we think it's very simple.  And when we

21  look at this language under New Jersey law, we have to

22  give every word meaning.  We can't treat anything like

23  mere surplusage.  And we don't look at extrinsic

24  evidence if the policy is clear.  Now, the word

25  thereafter, I think, is very clear, so we don't look at

MID L 006483-13    01/02/2019    Pg 24 of 84 Trans ID: LCV201950656
Case 2:23-cv-08047-KAS-AMD   Document 139-3   Filed 01/04/23   Page 28 of 83 PageID 07
348

22

1    extrinsic evidence.

2         And Ms. Pastor brought up what certain

3    witnesses said or didn't say.  One thing that she

4    didn't point out was their adjustor had said, sure, we

5    always look at makeup.  That's a common thing in the

6    insurance industry and that's why I started out by

7    mentioning, the two appraisers both recognize the

8    concept of makeup.  They didn't say, we're entitled to

9    take it under the policy but they recognize it as a

10   valid concept and a number that can be calculated and

11   they did calculate the number.

12        So our position is simple, Your Honor.  You

13   have to give meaning to every phrase and word in the

14   policy and, clearly, you've got to look at the probable

15   experience thereafter, which is the period -- after the

16   period of interruption and you look at both historical

17   sales to get the probable experience and then the due

18   consideration, you bring into your actual sales.

19        Very, very important, Your Honor, the policy

20   says thereafter, not during like it did in FINGER

21   FURNITURE and CATLIN SYNDICATES.  Thank you.

22        MS. PASTOR:  Your Honor, I would just like to

23   in rebuttal make two points, please.  Point one, the

24   language in CATLIN mirrors.  You'll find it in the

25   Court's opinion of July 15, 2016, specifically, at Page

```
 1   16.    Judge, --
 2               THE COURT:   I -- I have both FINGER and
 3   CATLIN sitting right in front of me.
 4               MS. PASTOR:   As Judge Francis noted, the
 5   provision there says, before loss and the probable
 6   experience thereafter had no loss occurred.   The second
 7   point, Your Honor, was there was mention of our
 8   adjustor.   As you'll see in our brief, the adjustor
 9   said that, yes, he was familiar with the concept of
10   makeup and had applied it in cases where a policy
11   expressly called for it.   This policy does not.   Thank
12   you, Your Honor.
13               THE COURT:   Thank you very much.
14               MR. WILSON:   Your Honor, can I just make one
15   point?
16               THE COURT:   Certainly.
17               MR. WILSON:   The -- in distinguishing the
18   FINGER FURNITURE, as Ms. Pastor just read the language,
19   it talks about you have to look at the business before
20   the loss and the probable experience thereafter.
21   Probable experience thereafter in that case modifies
22   the laws before the loss.   In our policy it says, you
23   have to look at the business before the period of
24   interruption and the probable experience thereafter.
25   Thereafter in our policy refers to the period of
```

1    interruption, not the loss.  The FINGER FURNITURE

2    policy was talking, you look at the experience during

3    the period of interruption and that's where the

4    distinction is.

5          THE COURT:  Okay.  The -- this is simply an

6    issue of interpretation of what the parties bargained

7    for and the quoted policy provision before this Court

8    reads, due consideration shall be given to the

9    experience of the business before the period of

10   interruption and the probable experience thereafter had

11   no loss occurred.

12         That's precisely in the CATLIN, which is

13   CATLIN SYNDICATE V. IMPERIAL PALACE, where the insurer

14   in that case had a dispute with the insured and, in

15   that case, the insurer was arguing that historical

16   sales figures should be considered when determining the

17   loss.  Imperial Palace said, sales figures after

18   reopening should also be taken into account.

19         In the FINGER FURNITURE case, it was the

20   reverse.  It was very similar to what happened in this

21   case.  It was the -- because, in that case, the insured

22   wanted to limit -- limit the experience, what happened

23   before and not take into account sales after and, in

24   the FINGER FURNITURE case, it was the reverse was same

25   as here where the insurer took the position that we do

 1    look to what happened thereafter.

 2            So in each of those cases, the policy

 3    language was almost verbatim what it is in this case.

 4    In this case, it says, in determining the amount of

 5    loss payable under this coverage and the -- in CATLIN,

 6    it was in determining the amount of the time element

 7    losses insured against this policy.

 8            In FINGER FURNITURE, it was determining the

 9    amount of gross earnings covered hereunder for the

10    purposes of ascertaining the amount of loss sustained,

11    almost identical to what is in this case because it

12    says, in determining the amount of loss payable under

13    this coverage.  It all amounts to the same thing.

14            In fact, in the CATLIN case, the district --

15    there was an argument that, in FINGER FURNITURE, there

16    was some difference in terminology under the agreement

17    but the principle was exactly the same because in

18    CATLIN, in determining the amount of time element as

19    insured against this policy -- by this policy, due

20    consideration shall be given to experience of the

21    business before the loss and the probable experience

22    thereafter had no loss occurred.

23            In FINGER FURNITURE, in determining the

24    amount of gross earnings covered hereunder for purposes

25    of ascertaining the amount of loss sustained, due

MID L 006483-13     01/02/2019     Pg 28 of 84 Trans ID: LCV201950656
Case 2:23-cv-08047-JMS-AMD     Document 139-3     Filed 01/02/2023     Page 27 of 83 PageID 11
352

26

1   consideration shall be given to the experience of the

2   business before the date of the damage or destruction

3   and to the probable experience thereafter had no loss

4   occurred.  So it's essentially the same.

5          And in CATLIN, the Court found that the

6   language of the business interruption provision mirrors

7   that of FINGER FURNITURE.  There was some distinction

8   because of the one said loss and the other said

9   business and they said that the usage damage and

10  destruction and loss and -- are functionally equivalent

11  in the two different policies.  In fact, they cite loss

12  is a synonym for damage in the unabridged dictionary.

13         So we, too, do the same thing and both of

14  those cases stand for the proposition, as plaintiff

15  argues, that there is no ambiguity in the agreement and

16  that the business interruption provisions are to be

17  determined only with respect to what happened before --

18  because this says and I'll quote from FINGER FURNITURE.

19  "The policy language indicates that a business

20  interruption loss will be based on historical sales

21  figures.  Specifically, the policy states that "due

22  consideration shall be given to the experience of the

23  business before the date of damage or destruction and

24  to the probable experience thereafter no loss

25  occurred."

MID L 006483-13     01/02/2019     Pg 29 of 84 Trans ID: LCV201950656
Case 2:23-cv-08047-JMS-AMD     Document 19-3     Filed 01/04/23     Page 28 of 83 PageID: 353

27

1          Historical sales figures reflect a business'

2     experience before the date of the damage or destruction

3     and predict the company's probable experience had the

4     loss not occurred.  The strongest and most reliable

5     evidence of what a business would have done had the

6     catastrophe not occurred is what it had been doing in

7     the period just before the interruption and it -- and

8     it says that the contract -- the insurer cannot look

9     prospectively to what occurred after the loss to

10    determine whether there was a business interruption

11    loss and, therefore, found in favor in that case in

12    FINGER FURNITURE -- in favor of the insured -- of the

13    insured and in CATLIN in favor of the insured.

14          Similarly, in this case, there was no makeup

15    provided anywhere in the insurance contract.  There --

16    the interpretation of the contract provision in this

17    case is as -- again, as the Court in CATLIN state -- in

18    CATLIN stated, it has to be determined on dictionary

19    definitions and plain meanings of what a loss is.  So I

20    find that there is no basis for the -- an

21    interpretation of this insurance agreement to be --

22    take into account actual losses sustained or made up

23    after the hurricane, after the named storm occurred

24    and, therefore, the motion -- the cross-motion for

25    summary judgment is granted.

1          Let me see if I have the order in front of

2    me.  Okay.  I'm going to try to put these -- okay.

3    We'll now hear from Mr. Wilson on the subsequent

4    motions, on defendant's motions.

5          MR. WILSON:  Thank you, Your Honor.  The

6    question now that you've ruled on this issue is what,

7    if anything, is left to try?  Is there anything in this

8    case and our position is, there is nothing left.

9    Makeup was the only outstanding issue.  There is a

10   separate bad faith claim, and we're not addressing that

11   because that's been severed.

12          So the question is, if this case were to

13   proceed to trial on July 23rd or whatever the date is,

14   what could we possibly try and, as you know, and we've

15   discussed before about when there was a dispute as to

16   the amount of a loss, we demanded appraisal.  They

17   opposed our demand for appraisal.  We did a motion to

18   compel and Judge Francis ruled in our favor and said,

19   you're entitled to appraisal.

20          One of the arguments Wakefern made was, well,

21   you don't get appraisals because you breached the

22   contract and the Judge said, well, there's no evidence

23   of a breach of contract.  I'm going to order you to

24   appraisal and the appraisers will value the loss.

25          So the appraisers went out and they valued

1   everything.  They had several days.  They looked at

2   everything.  They valued the selling price valuation.

3   They looked at this as interruption.  They looked at

4   makeup.  They looked at every issue.  So there's really

5   nothing left.

6              Now, Ms. Pastor will presumably tell you,

7   well, they delayed the payment of the loss, so we have

8   some delay damages.  She cannot quantify those delay

9   damages, though.  In any event, those delay damages

10  would be a bad faith claim because, under the policy,

11  there's no coverage for delay.

12             Number two, she'll say, well, we should get

13  some interest.  And, once again, the policy does not

14  provide interest and under the case law, she doesn't

15  get interest because they moved for interest following

16  the appraisal award and Judge Francis rejected that.

17             Now, there may be an interest argument under

18  the bad faith claim, but we're not talking about that.

19  So then the last thing is, well, what else do you have

20  and last time Ms. Pastor said, well, we have attorneys'

21  fees.  Well, attorneys' fees are not recoverable under

22  the policy.  They would only be recoverable in

23  connection with a bad faith claim.

24             So you have to ask yourself, Your Honor, --

25  and I know you have lots of experience as a trial Judge

1    -- what can we possibly try against Lexington?  All the

2    damages were valued by the appraisers.  There's nothing

3    left to value and Ms. Pastor cannot identify anything

4    that the appraisers didn't value or any damages they've

5    sustained that would be covered under the policy.  The

6    only issue that was left open by the appraisers was the

7    makeup and you've already decided that.

8         So if we were to empanel the jury, we would

9    go hear the testimony, you would have all the witnesses

10   come in.  At the end of the day, you would have to say,

11   well, what can they recover?  There is nothing left

12   under the policy, so summary judgment should be granted

13   as to the remaining claims under the breach of

14   contract.

15        And that, presumably, Your Honor, is there's

16   a motion to sever out there because, you know, they do

17   have claims against the broker but what's left against

18   the insurance company?  There's nothing now.  The only

19   thing that was left before was the makeup.  Now,

20   there's just nothing left to try.  There's nothing to

21   submit to a jury, and there's nothing that they can

22   point to that would be recoverable under the policy,

23   and that's putting aside the bad faith.  Thank you.

24        THE COURT:  Well, I'm sorry.  Isn't there

25   also a claim, if I read the record correctly, about

MID L 006483-13     01/02/2019     Pg 33 of 84 Trans ID: LCV201950656
Case 2:23-cv-09347-JMS-AMD   Document 39-3   Filed 01/04/23   Page 32 of 83 PageID16
357

31

1   Lexington's use of Location 700 and calculating the

2   total insured value?

3          MR. WILSON:  That would be a bad faith claim

4   because, what happens is, when you calculate the

5   deductible, you have to look at all the locations, so

6   the appraisers calculated the deductible.  So what

7   happens is, if I do Location 700, what should it be,

8   how should we value it, how should we do it, once

9   again, what do you get at the end of the day if I come

10  up with a number?  Well, we don't know what the

11  appraisers use because it was -- they didn't put it

12  down, but there's no more damages that could come out

13  of the appraiser's value of the holdoffs.

14          THE COURT:  Okay.

15          MR. WILSON:  Thank you.

16          THE COURT:  Thank you.

17          MS. PASTOR:  Your Honor, in terms of what

18  remains, what Lexington is really arguing is, we get

19  sued, we lose on appraisal, we just lost makeup but

20  what the Court should do then is enter summary judgment

21  that we didn't breach our contract?  That's not the way

22  it works.  What's left is narrow compared to the

23  brokers for sure but in confirming the appraisal award,

24  Wakefern asked for its interest and what Judge Francis

25  found was that had to await another day the breach of

1    contract because of the issues around the timing.

2              And so what he found was, it's up to a jury

3    to understand when did Lexington owe the money?  When

4    should it have paid?  Did it delay and, therefore, what

5    does it owe you for its delay and, therefore, what

6    would be tried is the fact questions around the fact

7    that Lexington didn't pay until after it was sued.  It

8    only paid part of an award in January of 2016, after it

9    was confirmed by the Court.

10             On the spoilage issues, it was aware of the

11   sales price and information relating to when Wakefern

12   sold things, when it anticipated sales date, all of

13   that.  It would have known that it had to pay sales

14   price, but it declined to pay until it's compelled and,

15   therefore, what a jury should be permitted to decide

16   is, should Lexington have paid earlier?  Did it breach

17   its contract and does it now owe interest, not only on

18   the spoilage that it withheld until after appraisal

19   but, also, on the makeup it withheld and the fact that

20   it inflated its deductible.

21             The Court found that the named storm

22   deductible applied and Lexington added 12.5 million in

23   values into that deductible and withheld $250,000 on

24   that basis.  A jury is entitled to hear that and

25   consider were those actions in breach of Lexington's

MID L 006483-13     01/02/2019     Pg 35 of 84 Trans ID: LCV201950656
Case 2:23-cv-19304-KMS-AMD   Document 139-3   Filed 01/24/23   Page 34 of 83   PageID 18

359

33

1    contract and, eventually, a jury is entitled to hear

2    the bad faith.

3         So it is the breach of contract that's left

4    because losing doesn't excuse you from breaching your

5    contract and it's the bad faith that's left, Your

6    Honor, and those are claims that come with material

7    issues of fact for a jury, including when Lexington

8    should have paid the amounts because what it previously

9    argued was that it supposedly didn't have the

10   information to pay the spoilage claim earlier and so a

11   jury will have to consider, did it have the sales

12   price?

13        Did it know anticipated sales date from how

14   it treated other claims, and did it decide not to

15   examine that information or ask for it and if Your

16   Honor is to look at documents, the one that I would

17   point you to is, Exhibit I in the motion papers, the

18   umpire who handled the appraisal, wrote to Judge

19   Francis, and specifically made mention that there had

20   been progress.  The problem is, some information now

21   felt important by Lexington had not been provided.

22   But, in fairness, it was only very -- requested very

23   recently.

24        So what a jury would consider is, if

25   Lexington supposedly needed something to pay that claim

34

1    in 2016, why during its investigation did it not ask

2    for it?  I would submit that what the jury will

3    eventually find is, Lexington didn't actually need it.

4    It knew.  It chose not to pay and, now, it owes the

5    interest and there is nothing in its contract that

6    absolves it from paying pre and post-judgment interest.

7    Thank you, Your Honor.

8              THE COURT:  Okay.  I'm sorry.

9              MR. WILSON:  If I could just make a few

10   points, Your Honor.

11             THE COURT:  Absolutely.

12             MR. WILSON:  I'll try to be very brief.  When

13   you have a breach of contract claim, you have to

14   establish that there was a contract, you have to

15   establish that there was a breach, and you have to

16   establish that there were damages.  That's where we

17   have the problem here.

18             Ms. Pastor talked about, well, you don't

19   dispute there's a contract.  There was a breach.  They

20   did this, they did that wrong, they should have paid

21   this.  Those were all bad faith things.  So even if the

22   jury said, yes, Lexington did this wrong, did that

23   wrong, and did that wrong, the next question is, what

24   are the damages?  There are no damages because the

25   appraisers have already valued everything.  They took

MID L 006483-13    01/02/2019    Pg 37 of 84 Trans ID: LCV201950656
Case 2:23-cv-19304-JMS-AMD    Document 139-3    Filed 11/04/23    Page 36 of 83 PageID 20
361

35

1   into account the policy language, how you determine

2   everything.

3           In terms of interest, there is no New Jersey

4   case law saying that you get interest if an insurance

5   company breaches a contract absent bad faith.  So the

6   only way you can get interest is bad faith and a breach

7   of contract.  And so what are we going to do with the

8   jury?  The jury will find out that they breached the

9   contract.  Say they did that and we don't agree that we

10  did, then we'll say, well, what are the damages?  Well,

11  the damages are zero because they fully recovered

12  everything.

13          So then what do you do from there?  So it

14  would be a waste of time and resources for a Judge and

15  a jury to sit through this case because there are no

16  damages and a fundamental requirement of breach of

17  contract claim is actual accruable damages.

18          THE COURT:  Well, clearly, the bad faith

19  claim would also be based -- predicated upon, in part,

20  computation of damages, interpretation of the contract,

21  and determination of whether there was a breach.

22  However, the cases, which really are more appropriately

23  -- more appropriately pertinent to the other side of

24  these motions, the brokers, PORTAS V. TAN (phonetic)

25  and LEVINSON V. D'ALFONSO, those -- those cases in the

36

1    context of malpractice hold that while, generally,

2    breach of contract claims are subsumed under the

3    professional negligence claims, that there could be an

4    independent breach of contract claim based upon the

5    actual contract, here, the insurance contract.

6         And all that the -- those cases, which

7    discuss whether or not there's a separate cause of

8    action for breach of contract in this case with a bad

9    faith claim, look to assure that the -- that the

10   plaintiff not be permitted to use a breach of contract

11   claim, a hedge against a possible dismissal of the

12   other claim and, in this case, there's independent

13   arguments, independent basis for the plaintiff to claim

14   a breach of the contract and to argue consequential

15   damages.  That's not for this Court to decide.  These

16   are issues of fact.

17        There are issues regarding how the -- what

18   the defendant did in analyzing the contract.  Did it

19   correctly do it?  Did it add things to the contract

20   that weren't supposed to be added, et cetera?  Those

21   are all part of breach of contract.  It's a specific

22   claim and, therefore, I find that they're not subsumed

23   by the bad faith claims and the motion is denied.

24        And I want to really, again, put on the

25   record, which I think is appropriate in this case that

1  the breach and the arguments and the analyses by both

2  Counsel in this case have made it easy.  When I got

3  this case, I thought, oh, my god, I have to -- I'm a

4  recall Judge.  I'm going to have to start coming in

5  five days a week.  But it turned out that it was -- it

6  was an interesting process, but it was made -- it was

7  -- it was rendered less complex by how able Counsel

8  both authored their reports.  You represented your

9  clients very well.  Thank you.

10        MS. PASTOR:  Thank you, Your Honor.

11        THE COURT:  All right.  Next, -- the next

12  motions, I think, are -- are the -- the next motions

13  are between Associated Agencies and BWD Group, which

14  I'll call the brokers moving for summary judgment to

15  dismiss plaintiff's claims, monetary claims or the cap

16  damages claims, damages in this matter and the -- so --

17  and as I understand it, the first -- the first motion

18  is to, number one, dismiss the complaint because while

19  there might be -- there are no negligence claims.

20  They're duplicative of those claims that are under the

21  professional malpractice claims.

22        Second, that there is -- on the professional

23  malpractice claim, there is no evidence that the

24  defendant brokers caused any -- plaintiff any damages.

25  It's a proximate cause argument.  There's also an

1   argument that the breach of contract, negligence,

2   breach of fiduciary duty claims are subsumed by the

3   professional malpractice claims and cannot be

4   independent pursued.  And, finally, that a breach of

5   contract claim also in these -- in the context of these

6   cases would be subsumed.

7           And, here, as I understand it, the brokers,

8   these two brokers, BWD Group and Associated Agencies,

9   had provided services to the plaintiff, Wakefern, over

10  a long period of time as their multitude of insurance

11  contracts came due and those included what an entity

12  such as Wakefern, which is a supermarket, retail,

13  warehouse, distribution operation.

14          There are a multitude of insurance

15  agreements, including workers' comp., transportation,

16  directors and officers' liability, environmental claims

17  and the like and the claims -- the casualty claims that

18  are covered by the Lexington contract, which were --

19  and the Lexington contract took effect in 2012.  I

20  think it was in October.  I think it was October, 2012.

21  The prior contract was an insurer called FM, and they

22  had the contract for the period 2011.  It expired in

23  2012.

24          ShopRite -- the ShopRite chain, the ShopRite

25  stores being supermarkets are a much different

MID L 006483-13    01/02/2019    Pg 41 of 84 Trans ID: LCV201950656
Case 2:23-cv-08037-JKS-AME   Document 139-3   Filed 01/24/23   Page 40 of 83 PageID 24
365

39

1  enterprise than a manufacturing and, I think, Counsel

2  in the prior case argued, we're not a manufacturing.

3  We're a service and distribution center.   Supermarkets,

4  we all know, have a very low profit, low percentage

5  margin of profit because of the nature of the flow of

6  income and inventory.

7          They also have a very, very, very high stock

8  of items, which their food -- a lot of it is food,

9  which could be spoiled.   So their casualty insurance is

10  extremely important to them, as are all the other

11  insurance policies.   So we have the insurance brokers.

12          They're to use their expertise to represent

13  the plaintiff and there is a client service agreement,

14  which was entered into in 20-- December, 2010, and it

15  was between Wakefern and its members and Associated

16  Agencies and it describes services and it indicates

17  there were -- they're one of two insurance brokers and

18  they will provide the brokerage services memorializing

19  the agreement and then there's a description of

20  services in Paragraph 4 and it includes, specifications

21  will include but are not necessarily limited to

22  recommendations for appropriate insurance limits,

23  effective policy periods, coverage wording and

24  deductibles for self-insured retention and then it goes

25  on and on and on.

1          Next is the BWD Group -- I thought I had it

2    right in front of me.  Oh, excellent.  I put these

3    together.  Oh, okay.  I had it buried under the NJAC

4    provisions.  Client services agreement for insurance

5    broker and risk management services between Wakefern

6    Food Corp. and BWD Group, LLC, and that was also for

7    the period 2012 going forward and the recommended

8    insurance coverage specifications would include under

9    4.2 but not necessarily limited to recommendations for

10   appropriate insurance limits, effective policy periods,

11   coverage wording and deductibles, or self-insured

12   retention, et cetera.  So there we have the agreements.

13   So there are two agreements between the parties.

14          The -- so the brokers surveyed that they're

15   appointed tasks and they compared policies that were

16   suitable for the ShopRite organization.  Now, I

17   recognize, there are so many ways in which supermarket

18   and their distribution, transportation, et cetera,

19   facilities are different from manufacturing but, also,

20   because this is not a unified entity and because of the

21   long-term relationship, I'm going to find that there's

22   no dispute of fact that the defendant brokers knew

23   that, among other things, in ascertaining what would be

24   an appropriate policy included the price of the

25   premium, the cost of the premium in the policy because

MID L 006483-13     01/02/2019     Pg 43 of 84 Trans ID: LCV201950656
Case 2:23-cv-03047-KM-AMD   Document 19-3   Filed 01/24/23   Page 42 of 83 PageID 26
367

41

1    ShopRite has members, which in many cases, are single

2    stores.

3              The size of the store varies.  The volume of

4    the store varies.  The value of the store varies.  They

5    also have units, which are multi-store units and those

6    individual owners and I will call corporate owners have

7    divergent use of how do we evaluate what's important to

8    us in obtaining an insurance policy?  Is it the

9    deductibles?  Is it the risk?  Is it the cost of -- the

10    annual cost of the premium for the policy.  So all of

11    these things have to be taken into account, all of

12    them.

13              What I read in 4.2 of each of those contracts

14    provides that we're taking into account a lot of

15    different things.  So on paper, this is what the

16    brokers contracted to do.  Now, the defendants -- the

17    plaintiff claims that when -- and the plaintiff has

18    several committees.  They have risk management

19    committee, they have an insurance committee, and I'm

20    just using these in generic terms.  I'm not going to

21    give the -- I'm not going to -- because I would have to

22    go through all my writeups and find out what the names

23    of the committees were.  But these are committees

24    consisting of representatives of a diverse group of

25    owners.  It's not just a department within a

42

1  corporation.  In this case, it's a department of --
2  it's a committee of diverse interests.
3        And the crux of plaintiff's claims is that
4  there was a spreadsheet and the spreadsheet gave
5  comparison of the -- oh, they accepted proposals and
6  narrowed them down to two, which they thought were
7  appropriate for consideration for the 2012/2013 period.
8  And the existing insurer, FM, had a proposal.  That
9  proposal was based upon a savings in premium -- sorry
10  -- was based upon a premium, which was, I believe, a
11  little over $5 million.  I'm looking.  I could find it,
12  but there were -- there were two quotes, the FM and the
13  contract with Lexington.
14        And Lexington's contract saved over a million
15  dollars in premium costs.  The deductibles were
16  somewhat different because FM had $100,000 deductible.
17  Lexington had a $25,000 deductible in general, except
18  what Lexington had was a named storm deductible.  The
19  named storm deductible was two percent of the total
20  insured value.
21        So the claim is -- and, of course, this is
22  not -- not, of course, a finding of fact, but the claim
23  is by the plaintiff that, throughout the process, the
24  broker defendants were in constant contact with several
25  individuals from Wakefern who handled insurance and

MID L 006483-13    01/02/2019    Pg 45 of 84 Trans ID: LCV201950656
Case 2:23-cv-19304-KMS-ABD   Document 139-3   Filed 01/24/23 Page 44 of 83 PageID 28
369

43

1   risk management and plaintiff had a retail insurance

2   committee and they were presented with a spreadsheet,

3   which showed that the total cost of the premium for the

4   FM would have been almost 5.8 million for the period

5   and for Lexington, it would have been four-and-a-half

6   million dollars for the period.  So it's about a

7   million three difference.

8          And the claim of the plaintiff is that the

9   defendants never specified to the plaintiff's insurance

10  committee, to its -- we have Mr. Hoffman and Mr.

11  Cameron.  We have all kinds of communications that went

12  back and forth but the claim is they never told us that

13  the total insured value, deduction for a named store

14  would be in this case a $19 million and change

15  difference between the deductible, had we used the FM

16  policy.

17         Had we used the FM policy, we would have had

18  a deductible of some approximately 4 million and under

19  Lexington, it was 23 million, so there is an extra $19

20  million in risk for a named storm and they claim that

21  that constituted a breach of contract, among other

22  things, and a breach of it was professional negligence,

23  not to specifically highlight Wakefern.  We have this

24  other policy.  It's cheaper.  It will save you a

25  million three a year, but we want you to know that

1    there's a named storm deductible.

2          Now, named storm deductibles, hurricane

3    deductibles and the like are not necessarily new but

4    the claim is.  This was new.  After Hurricane Irene and

5    Katrina and all the devastation along the Gulf Coast

6    ports and Florida, and Mississippi and the like and

7    Hurricane Irene, which had a lot of damages in New

8    Jersey, the insurers were passing along some of their

9    risk by raising deductibles and imposing for their --

10   changing their hurricane deductible to a percent of

11   total insured value with the business, et cetera.

12   They're putting in -- they're decreasing their exposure

13   by raising the deductible.

14         And the position of the plaintiff was, as

15   professionals, they owed an obligation to us to have --

16   when they gave the spreadsheets, they should have in

17   its analysis highlighted and included there is for

18   named storms, two percent of total insured value and in

19   your case, the total insured value, they could have

20   even done it by one store, said, we'll take a -- we'll

21   take a representative store.  This store has a total

22   insured value of this much money.

23         And if there's a hurricane which is named, a

24   storm which is named like Irene, you're going to have a

25   deductible of two percent of that amount, not the

1    $25,000 that is or the 100,000 that is the general

2    deductible for all other claims, other than a named

3    storm, but you're going to have this happen.  And the

4    claim is, well, we were deprived of the opportunity to

5    take into account, factor in that additional exposure,

6    financial exposure to us in determining which policy to

7    receive.

8         The defendants say, okay, assuming that a

9    jury finds that, we're not saying that your

10   professional negligence claims themselves have no

11   merit.  But what we're saying is, even if everything

12   you said was true and even if we did all of that,

13   you're not showing us that there's proof that --

14   there's evidence to support a claim that you would have

15   gone with another insurer because you're saving a lot

16   of money on this and that was a prime reason for what

17   you're doing.

18        And if -- you don't -- you also don't have

19   any proximate cause because you can't show that there

20   was within the price range that we have, another policy

21   that's comparable that would have been cheaper and,

22   also, you might not have even -- you might not have

23   taken -- you might have taken the premium as the

24   primary value to be taken into account in deciding

25   which policy to take because of all your individual

MID L 006483-13    01/02/2019    Pg 48 of 84 Trans ID: LCV201950656
Case 2:23-cv-03047-KM-JBC    Document 33-3    Filed 01/04/23    Page 47 of 83 PageID: 31
372

46

1   stores who are most concerned about the premium, so

2   there's no proximate cause.

3           Also, there's an argument that the other

4   claims, breach of contract, breach of fiduciary duty,

5   and negligence claims are duplicative of and subsumed

6   within the claim for professional malpractice and so we

7   -- I don't know whether it's going to be Mr. Wamser or

8   Mr. Deal or Ms.-- who is going to be arguing for

9   Associated Agencies?

10          MR. DEAL:  Your Honor, I'm going to be

11  arguing for Associated.

12          THE COURT:  Okay.  You're Mr. Deal?

13          MR. DEAL:  Yes, sir.

14          THE COURT:  Okay.  Mr. Deal, go right ahead.

15          MR. DEAL:  Okay.  Thank you, Your Honor.

16  Your Honor, although I don't necessarily feel that some

17  of the issues you just reiterated are relevant to the

18  motions that we're here for because we're really here

19  on two or three limited --

20          THE COURT:  Yes.  I'm -- I'm giving a lot of

21  what I read about --

22          MR. DEAL:  I understand and I -- but I do

23  feel compelled to touch on a couple of issues.

24          THE COURT:  Go right ahead.

25          MR. DEAL:  It's interesting that you chose to

1    compare the FM policy because, ultimately, when we get

2    to proximate cause, we're going to talk about the fact

3    that they haven't put up any policy that they feel was

4    better at the time.  They certainly haven't suggested

5    that it was the FM policy.

6            But all I want to point out is, in your

7    dissertation, Judge, what you missed was the

8    differences between the FM policy and the Lexington

9    policy were great and I only touched on a couple of

10   them.  I'll put the numbers and terms with regard to

11   the premium in terms of percentages.

12           The first offer from FM was a 27 percent

13   increase in their prior premium.  The second offer was,

14   I believe, a 49 percent increase.  What they did was on

15   their first offer -- and this is what's really critical

16   and we're not really here for a policy evaluation

17   because they haven't made one.  We're here to say that

18   they haven't made one.  But they lowered or they raised

19   the deductibles and they lowered the sublimits is what

20   FM decided to do.

21           So as a result of the hits they took from

22   Irene and a snowstorm that was unexpected and the

23   millions of dollars in claims that they had to pay

24   under what was a prior 18-month policy, they not only

25   wanted to jack up the premium first 27 percent and then

MID L 006483-13    01/02/2019    Pg 50 of 84 Trans ID: LCV201950656
Case 2:23-cv-09047-KMS-AMD    Document 139-3    Filed 01/24/23    Page 49 of 83 PageID 33
374

48

1    upwards of 40 -- I had 47, 49 percent, but they wanted

2    to raise the deductibles and lower the sublimits, which

3    at that point became a no can do, so to speak, with

4    Wakefern.  So that was the first issue I just wanted to

5    point out, even though, again, I don't think that it's

6    relevant to our proximate cause argument.

7            The second issue, again, that Your Honor

8    discussed that I don't know is necessarily relevant but

9    in paraphrasing the defenses, I just want to throw out

10   there, if we were here to argue the breach issue, if we

11   were here to argue whether or not the brokers breached

12   their standard of care and/or breached their contract

13   and, therefore, the issue of what the broker's defense

14   is to that issue is relevant, I think what needs to be

15   at least placed onto the record is the fact that, if

16   you buy into their statement that the brokers never

17   said, by the way, you have a two percent named storm

18   deductible in your policy and that two percent just at

19   one store can cost you X, okay, that's not really what

20   they're saying.

21           What their guy is saying, they didn't tell us

22   the two percent of named storm applied to our

23   inventory, okay?  So the retort to that is, so the two

24   percent applied to your bricks and sticks.  So you knew

25   that you have all of these buildings all over New

MID L 006483-13    01/02/2019    Pg 51 of 84 Trans ID: LCV201950656
Case 2:23-cv-18047-KM-AMD    Document 39-3    Filed 11/24/23 Page 50 of 83 PageID 34
375

49

1    Jersey that have some great value.  You had an idea

2    that this policy, this -- had a two percent named storm

3    deductible that would have applied to your real estate

4    and, in fact, in Sandy, it applied to one building at a

5    cost of $15 million.  So they at least were aware of

6    that, and I only want to right the record on those

7    issues, Judge.

8         In terms of the proximate cause issue, --

9    and, again, I'm trying to read my notes from what you

10   were going through here.  Basically, Your Honor, I

11   guess, what I want to go back to is it's a basic tenant

12   in law and I think Mr. Wilson addressed this this

13   morning, although I'm going to go a little bit further.

14   Whether you look at negligence law or contract law

15   because they have those both theories at this point and

16   we're going to circle back to that issue but, you know,

17   it's a basic tenant of law that you have to prove that

18   it's negligence, breach of a standard of care,

19   proximate cause, and damages.  The jury gets a

20   questionnaire whether it's a slip and fall case or

21   whether it's a malpractice case or an ENO case.  Those

22   are the things they have to issue.

23        We're not here to argue the breach because,

24   clearly, there are disputes of fact and there are

25   certainly experts who dispute the issue.  We are here

MID L 006483-13    01/02/2019    Pg 52 of 84 Trans ID: LCV201950656
Case 2:23-cv-03047-KM-AME   Document 39-3   Filed 01/24/23   Page 54 of 88 PageID 85
376

50

1    limited to the proximate cause issue and I -- we took

2    the liberty of getting a copy of the record from our

3    last argument, just to help refocus our argument here

4    and I think where we got caught up last time -- and

5    when I say we, I'm talking about the Court and the

6    parties and mainly because it's Wakefern's argument is

7    they keep coming back to the breach issue and they keep

8    ignoring the fact that the law says, they have to show,

9    they have to compare, they have to show to get to

10   damages that there was a policy that was available that

11   was better than this policy.

12          And just saying, oh, by the way, you guys

13   talk to FM and you guys talk to Lexington isn't enough.

14   They need expert proofs.  They need an expert to

15   compare the policy and not compare the policies after

16   Hurricane Sandy, okay, but to first compare the

17   policies before to see what was the better policy

18   because one of the arguments they're making is that our

19   client, Phil Corso (phonetic) from Associated, said it

20   was a superior policy, superior to what there was at

21   the time.

22          But they need to be able to show that there

23   was a policy that would have paid them more than the

24   $26 million that Lexington paid them and they haven't

25   done that.  Their expert wasn't able to do it.  When we

1   questioned our expert about it, he kind of flubbed

2   through his testimony and he said, well, the Zurich

3   policy.  Well, what Zurich policy?  Well, -- well, why

4   the Zurich policy?  Heh doesn't even say which Zurich

5   policy.  Why the Zurich policy?  Well, because they're

6   the insurer now and they didn't required two percent

7   named storm deductible, so you have to assume they

8   probably wouldn't have required that.  Well, that's not

9   going to be good enough.  He's not going to get that

10  before the jury and that's just not a --

11          Actually, he went onto acknowledge that he

12  really didn't do an analysis of what policies were

13  available on the market for an entity such as Wakefern

14  in 2012.  Then you go to their risk manager.  Their

15  risk manager, Craig Hoffman, who was produced not only

16  as a fact witness but was produced as their corporate

17  designee as to damages and when he's asked a question,

18  so, you know, you weren't happy with this policy.  In

19  fact, there's an early e-mail from him where he sends

20  out something to a group of people saying I was sold a

21  bad policy.  So you feel this was a bad policy, sir,

22  well, use the term bad policy.  Which policy do you

23  think you should have had?

24          Well, he says the Zurich policy from 2013.

25  Well, why?  Well, I'm not really sure other than they

 1   didn't require us to get a named storm deductible.  So,

 2   you know, you have both their expert and their witness

 3   talking about 2013.  And then their response to motion,

 4   for the first time, I mean, three-and-a-half years,

 5   now, we're going on four years in this case.  They've

 6   never identified this witness from Aon (phonetic), this

 7   Joanne Quintal (phonetic), as someone who is going to

 8   give opinion testimony in this case, more or less

 9   expert testimony.  But she's deposed on issues that are

10   not really relevant to the issue before the Court

11   today.

12        But what Wakefern argues in opposition to our

13   motion on proximate cause is that this Joanne Quintal,

14   who worked for Aon and Aon was the subsequent broker

15   and Aon was the broker that secured the Zurich policy

16   the following year, she's going to talk about what she

17   was able to do in 2013 to get a policy without a named

18   storm deductible.

19        The problem is, number one, as I said, she's

20   never been identified as an expert, never been

21   identified as someone that's going to give that

22   opinion.  She certainly didn't give that opinion when

23   she was deposed and I know Counsel is going to argue

24   she was never asked that.  She certainly didn't give

25   the opinion.  We asked her a lot over two days.

1          And 2013 isn't relevant.  The relevant time

2    period is 2012.  So what we have here is, they can't

3    bridge the alleged breach which, you know, for purposes

4    of argument today, there is no argument on.  Two, there

5    are damages in the case.  They can't make a proximate

6    cause argument because they don't -- there's no damages

7    that they can allege we caused unless they can show

8    there was a better policy out there that these brokers

9    failed to show us.  And, Your Honor, that's our

10   argument on proximate cause.

11         The way we handled it last time, I think it's

12   probably easier to handle it handle it if we all just

13   deal with that issue and then move onto the next one.

14   Is that okay?

15         THE COURT:  Sure.  Although I think the

16   others are simple enough.

17         MR. DEAL:  That's fine.

18         THE COURT:  Let's do it all at one time.

19         MR. DEAL:  That's okay, Judge.  Yes.  In

20   terms of the issues regarding the -- and I know we

21   phrased our motion as a motion to dismiss or it's

22   really, you know, a partial motion for summary

23   judgment.  I've heard the same issue be called merger

24   of claims.

25         If you look at what the plaintiff's claims

54

1    are, -- and I say if you look at them, if you look

2    actually at their complaint and you look at the

3    allegations and you look at what they're saying,

4    basically, they're all the same allegation.  The crux

5    of their case is, basically, that the brokers breached

6    their common law duties.  Their common law duties are

7    to act with reasonable skill, care, and diligence.

8              Now, Your Honor referenced the CSAs, the

9    client services agreements, which lay out duties,

10   various duties that the brokers agreed to perform.  But

11   the CSAs, those contracts don't change what the

12   broker's duty are and the law.  They just give them

13   additional things they have to do.  It doesn't mean

14   that if they don't do those, you don't go back to that

15   they failed to act with reasonable skill, care, and

16   diligence.  Okay?

17             There may be an issue in this case somewhere

18   along the line -- and, again, we're not arguing here --

19   as to whether those duties within the client services

20   agreement created a special duty of care or a special

21   standard of care, but that's not what we're here to

22   argue.  All we're here to argue is whether or not the

23   claims that Lex-- or that Wakefern brought up or that

24   Wakefern alleged in their complaint, the breach of

25   contract, breach of fiduciary duty, negligence, and the

MID L 006483-13    01/02/2019    Pg 57 of 84 Trans ID: LCV201950656
Case 2:23-cv-03047-KM-AMD    Document 39-3    Filed 01/04/23    Page 56 of 83 PageID 40
381

55

1    professional negligence claims are more or less the

2    same claims and Your Honor has read everything and

3    you've read the arguments from previously and you can

4    see and, again, I would just ask you to take a look

5    back at the contract, that they're more less the same

6    claims.  They more or less -- this is -- I said this

7    before.  You know, I've been practicing law a long

8    time.  In professional negligence cases, whereas you'll

9    often see the pleadings come out this way and what I

10    mean by that is, the pleadings to include a breach of

11    contract.

12           I think a lot of the case law on this issue

13    involves attorney malpractice cases.  So the breach of

14    contract claim, often times, it's fee agreements or

15    it's, you know, plaintiff -- plaintiff personal injury

16    attorneys where they have a fee agreement and it's

17    alleged that they breached the fee agreement, so

18    there's a professional negligence and a breach of

19    contract.  All of those things basically come under the

20    same standard of care and for purposes of this case, we

21    feel that those claims should all be merged, dismissed,

22    really go to the jury as a professional negligence

23    claim.

24           The last issue, Your Honor, which is the

25    measure of damages for Wakefern and, again, I was, you

1   know, listening to the arguments this morning and I was

2   listening to Your Honor and you talked about contract

3   interpretation.  I think this is simply nothing more

4   than a contract interpretation.

5          I think the argument here is how do you

6   interpret what the damages are that Wakefern can attain

7   or can get in this case and you have to look back at

8   the Lexington policy and you have to look at the

9   sublimits of liability and you have to make a

10  determination that their damages, their spoiled food so

11  to speak, and I know there's more to their damages, but

12  that's the greatest part of their damages, were created

13  by off-premises service interruption and, therefore,

14  the appropriate sublimit that should be applied is a

15  $25 million sublimit.  There's another sublimit, $15

16  million that all applies to the Hoboken store, which

17  we're really not -- there's no dispute over.  But

18  Wakefern's damages should be limited to that $25

19  million sublimit pursuant to what they had available to

20  them under the Lexington policy.  Thank you, Your

21  Honor.

22          THE COURT:  Okay.  Thank you very much.

23  Okay.  Now, I'll hear from --

24          MR. WAMSER:  Yes.

25          THE COURT:  I'm sorry.  Yes?

1              MR. WAMSER:  Thank you, Your Honor.

2              THE COURT:  From BWD.

3              MR. WAMSER:  BWD.  Just a couple of points, I

4    think, --

5              THE COURT:  Sure.

6              MR. WAMSER:  -- between the last oral

7    argument that you reviewed and Mr. Deal that had been

8    given enough information.

9              The only thing I wanted to mention is that,

10   speaking just on the reversal here, the sublimit issue

11   and I think Mr. Wilson actually mentioned before where,

12   you know, every -- you know, you really need to try to

13   give the -- every part of the contract meaning and the

14   language should have meaning and, in the sublimit, in

15   the service interruption sublimit and the Lexington

16   policy states that or provides that the service

17   interruption sublimit is part of and not in addition to

18   the named store sublimit.

19             So that contemplates that there is -- if

20   there could be a service interruption caused by a named

21   storm.  So I know the plaintiff argued that there's a

22   law of the case based on Judge Francis' decision early

23   on in the case that it's a named storm and, therefore,

24   it's the law of the case and the named storm sublimit

25   should apply, but that's just not the case here and

 1   that wasn't the holding in Judge Francis' decision

 2   either, that there -- and definitely in particular with

 3   the language here that you could have a service

 4   interruption loss that was caused by a named storm and,

 5   therefore, the service interruption sublimit should

 6   apply, more specifically, the off-premises service

 7   interruption sublimit.

 8           Just to touch on the causation issue, I think

 9   it's more than just that the plaintiffs can't point to

10   any policy.  It's really not just any policy.  The

11   plaintiff could speculate and say, well, you could have

12   gone to 50 more insurance markets.  You could have --

13   and they could have offered a premium that was twice as

14   much.

15           You know, the plaintiff had -- it's their

16   burden to show that there was not only a policy out

17   there that possibly would have paid more than the

18   Lexington policy but that they would have paid for it

19   and would have been at or around the same price.  It's

20   not just then they can sit back and now turn around in

21   hindsight and say, well, we would have paid double the

22   premium, if it didn't have a named storm deductible.

23   It's just not the evidence in this case.

24           All the evidence in this case points to very

25   limited options.  You have the FM renewal, which was an

MID L 006483-13    01/02/2019    Pg 61 of 84 Trans ID: LCV201950656
Case 2:23-cv-18047-JMS-AMD    Document 139-3    Filed 01/24/23    Page 60 of 83 PageID44

385

59

 1    exorbitant increase in the premium, and you had Zurich,

 2    but that had a $1 million self-insured retention and,

 3    also, a named storm sublimit, so it doesn't get you

 4    anywhere, either of those options.

 5           And the last thing is that there's some

 6    discussion about Joanne Quintal, the Aon broker, and

 7    also their expert, Mr. Lipschultz (phonetic) talking

 8    about any option in 2012.  There's no other -- there's

 9    no evidence at all about any other options than what

10    I've already discussed in 2012.

11           Ms. Quintal, all she could discuss and all

12    she testified to was 2013.  There is no evidence that

13    she had any knowledge of the market in 2012.  I mean,

14    if she did, it would be completely irrelevant to this

15    particular account.  They need to show that someone who

16    knew the market of a supermarket in this area, in this

17    geographical location and with the carriers and their

18    contacts in this location.  You can't point to the

19    entire country in the world and say there is some other

20    policy out there or some other insurance company.  So

21    and that, again, is plaintiff's burden to show in order

22    to establish the causation.  And that's all we have,

23    Your Honor.  Thank you.

24           THE COURT:  Thank you.  Counsel?

25           MS. PASTOR:  Thank you, Your Honor.  Let me

1  start with a few issues and I'm going to start first

2  with this notion of causation.  What you're hearing is

3  causation on the professional malpractice claim and the

4  brokers are just assuming somehow everything else

5  disappears and what they're ignoring is there's nowhere

6  in the contracts and their contracts are very detailed

7  and as the evidence is going to show at trial, they

8  drafted them but in their agreements detailing all the

9  services they're going to provide, there's nothing in

10  here that says, and you're limited to the following

11  types of damages.

12          In fact, Wakefern's contract has no

13  limitation.  It's entitled to typical contract damages.

14  Now, here's why, though, this contract couldn't

15  possibly merge with the professional malpractice claims

16  or, frankly, any of the claims could possibly merge.

17  They are all distinct.  Let me give you an example.

18          In each of the contracts, under the

19  description of services, 4.3E is that they will provide

20  technical assistance with the interpretation of policy

21  terms and conditions.  What that meant was, BWD told

22  Wakefern it had attorneys on its staff.  Its

23  professional assistance was going to include having

24  attorneys provide coverage interpretations.  That

25  didn't happen here.

MID L 006483-13    01/02/2019    Pg 63 of 84 Trans ID: LCV201950656
Case 2:23-cv-19304-KMS-AMD    Document 139-3    Filed 01/24/23 Page 62 of 83 PageID46
387

61

1          Whatever a broker, a plain vanilla broker may

2     owe under New Jersey law, these broker consultants owed

3     more and that included having their attorneys review

4     the policies the way they promised they were going to

5     do that in their contract with Wakefern.  So the cases

6     that they cite about this merger proposition have no

7     basis where the contract is broader than and different

8     than the standards that would apply.

9          Now, for sure, brokers are fiduciaries in New

10    Jersey, but your average retail broker doesn't provide

11    legal interpretations from their attorney staff.  The

12    other thing that it ignores is the special

13    relationship.  The claims pled are not just contract

14    and negligence.  Among the tort claims are breach of

15    fiduciary duty because of a special relationship.

16          What the brokers ignore is that they told the

17    client over 30 and 50 years, the services they would

18    provide and promised that they were going to go beyond

19    and promised that they understood these companies

20    better because of their long-standing relationships

21    with them because they placed not only coverage for

22    Wakefern Food Corp. and the members of this policy

23    property but the other litany of policies because they

24    were the exclusive brokers for that.

25          But they also went to each of the individual

62

 1   members and they marketed to them and they provided

 2   their auto insurance and their personal insurance and

 3   other things at the store.  And so the claims are

 4   different and can't all merge together because these

 5   are not just your plain vanilla brokers and when you're

 6   a fiduciary like these brokers were with a special

 7   relationship, under New Jersey law, you're required to

 8   do more.

 9          For example, there's case law in New Jersey

10   that you're required to tell your client, if you think

11   there's no market and they can't buy something to

12   protect themselves, then you raise your hand and you

13   tell them that.  You don't tell them that you've

14   fulfilled your contract's obligations to provide them

15   with the best available insurance to best protect them

16   to the highest standards that you've promised and then

17   say, you know what, now that we're sued and you didn't

18   get the coverage, we didn't tell you about all these

19   flaws and warts on it, now, it's really your fault and

20   there wasn't anything better out there.  Now is not the

21   time to say that.

22          The time to have said that, if it were true,

23   and I submit it's not, is when they were sitting in the

24   retail insurance committee meeting with owners of these

25   companies and they didn't say it.

MID L 006483-13     01/02/2019     Pg 65 of 84 Trans ID: LCV201950656
Case 2:23-cv-03047-KM-AME     Document 139-3     Filed 01/24/23     Page 64 of 83 PageID48
389

63

1          Now, Your Honor referenced the premium.  Even

2     that is a fact issue and here's why, because the

3     brokers will try to argue -- and some of their people

4     have testified about, you know, the premium was

5     important, this policy was less and we have an expert

6     who will say, that's the problem.  They were,

7     apparently, at least if you believe that testimony,

8     more concerned about saving a little money than the $19

9     million difference in deductibles between an expiring

10    and this policy.

11         What Wakefern's people testify are, we didn't

12    have a budget.  We wanted the best product for the best

13    price.  If you're telling us they're comparable and I'm

14    going to save a little money, sure, go with the same

15    thing that's less.  But if they're not the same, you

16    needed to tell us and they didn't tell them and there

17    were consequences.

18         Now, on causation, what is it that the

19    evidence is going to show?  Well, in our papers, we

20    showed you some of the differences where they say

21    there's no proof you could have bought a better

22    product.  Well, there is a broker who while the

23    Lexington policy is still enforced begins negotiating

24    for the next year.  She negotiates not only with

25    Lexington about renewing Lexington's policy but they go

1   out and she testifies and we've given you her testimony

2   to a market full of other insurers that include Zurich.

3          Now, why is Zurich important?  Well, they

4   claim that they went to Zurich, too, that they

5   recommended the Lexington policy over Zurich.  And what

6   did the Zurich people write after Sandy, after 50 plus

7   million dollars in losses?  They wrote a policy that

8   didn't have a two percent total insured value

9   deductible.  They were willing to write even after

10  Sandy and for this insured while the Lexington policy

11  was enforced a policy that would follow it that would

12  have a $1 million flat deductible.

13         And so there will be testimony not only from

14  Ms. Quintal about that but, frankly, Wakefern, who

15  bought the policy and the Court can read the policy and

16  the jury can see the policy.  What no one ever said

17  back then is, you should buy the Zurich policy.  They

18  were told, no, no, no, Zurich has got a $1 million

19  deductible.  This Lexington policy is much better.

20  It's got a base 25.  Well, as it turns out, it had a

21  lot more than that and the brokers did not reveal it.

22         The other point, Your Honor, is you were

23  talking about the comparison and the one document that

24  was shown.  That wasn't shown to the Retail Insurance

25  Committee.  That was shown to one person, Mr. Hoffman,

1   they allege and there will be fact questions about what

2   was shown to Mr. Hoffman and what was said to Mr.

3   Hoffman.   Where there is no fact question and they

4   agree is, they sat in a meeting on September 24th of

5   2012.   They watched a slide come up in front of all of

6   the Retail Insurance Committee members, including

7   owners, that said $25,000 deductible and no one said,

8   that's not the deductible for the Lexington policy.

9   You guys need to understand this named storm

10  deductible.   Let us tell you why you should still buy

11  this policy even though it has that.

12          And, in fact, BWD was asked, why -- did you

13  know when you sat there about that deductible?   And

14  they will have a person who will testify, he claims,

15  claimed at his deposition, I was fully aware.   I knew

16  that there was a deductible of that particular

17  magnitude and I chose not to say anything.   A jury

18  needs to consider that, Your Honor, in terms of not

19  only causation but in terms of the damages because

20  Wakefern had options.   It didn't have to buy this

21  policy but if it had known about what this policy had,

22  it certainly could have considered things.

23          What could it have considered?   It could have

24  considered extending the policy the year before.   It

25  could have considered buying the policy the year

 1   before.  It could have said, go back out and talk to

 2   Zurich and see if you can get the same policy where we

 3   were able to buy the following year at a better -- with

 4   better terms, none of which happened in this case.

 5           Now, in terms of their motion, their motion

 6   is replete with fact questions and I didn't frame their

 7   motion, they did.  So to walk away from all of the fact

 8   questions and the fact that you gave exhibits up to, I

 9   think it's double lettered exhibits like BBB, that

10   wasn't my doing, that was theirs.

11           But if there's any question there were fact -

12   - or any issue that there are fact questions, the Court

13   need look no further than their material statement of

14   fact, which they say supports their motion,

15   specifically at Items 48, 49, and 54 because, there,

16   they claim, BWD received a quote from Lexington for the

17   Lexington policy at issue.  Well, they've never

18   produced that quote, so that's disputed.  They produced

19   a quote for a different product with a $1 million base

20   deductible.  They didn't give Wakefern a quote for this

21   and if they say they did, it's a fact question and it's

22   an issue for the jury.

23           But they claim that in terms of that quote

24   that they supposedly provided, that they -- that at a

25   meeting, Mr. Hoffman was provided with all of the

 1   essentials about the proposal and a copy of that

 2   proposal.  That's disputed.  Mr. Hoffman will testify

 3   and Wakefern has no document that is the "for this

 4   policy nor was it given to the Retail Insurance

 5   Committee, nor did they produce it.  So there are fact

 6   questions that require that the motion be denied.

 7           In terms of the issue of the -- you know,

 8   what will we produce?  Well, we'll product the expert,

 9   Mr. Lipschultz, who is going to say these guys were so

10   busy focused on, you know, premiums that they missed

11   the forest for the trees, that they didn't tell

12   Wakefern, that they didn't give Wakefern options, and

13   that we have a Zurich policy a year later.

14           In their briefing, they argue, well, you

15   can't look at what Aon did.  Aon is a big broker.  They

16   have -- you know, it's speculative.  They were a

17   fabulous broker.  We might not have been able to get

18   that kind of good stuff like Aon did.

19           Here's why it's important not to merge the

20   claims, because that kind of admission is exactly what

21   shows that they breached their contract because, in

22   their contract, they said, they were going to perform

23   to the highest standards in the industry.  So you don't

24   get to stand here now and say, some better broker could

25   have done a better job than we did because you promised

1   to function just like that other broker.

2          As far as the damages and this issue of the

3   cap, as I said, New Jersey law doesn't say, when you do

4   a bad job and when you breach your contract, there's

5   some limitation.  When you don't tell your policyholder

6   that they're buying a bad contract, that the policy

7   with warts becomes the cap or the most that you can

8   collect.

9          Any kind of sublimits, whatever the

10  deductible may have been, the sublimits may have been,

11  that was in a contract with Lexington.  That's not

12  their contract.  There's no limitation in theirs.  But

13  more importantly than that, there's no New Jersey law

14  that says, you're limited.  If your broker buys you a

15  bad policy, not only when they get held liable, they're

16  liable then for only the amount of damages in the bad

17  policy that they bought you.

18          So, you know, going back to what are the

19  issues here for the jury and on this issue of

20  causation, the jury is entitled to hear what they

21  provided, what they didn't provide, whether Wakefern

22  had options, including the ones that they could have

23  explored like the Zurich policy.  Ms. Quintal testified

24  that the year after, she could have also gotten the

25  same policy from London.  London was willing to write a

MID L 006483-13    01/02/2019    Pg 71 of 84 Trans ID: LCV201950656
Case 2:23-cv-03047-KM-AMD   Document 39-3   Filed 11/24/23   Page 70 of 83 PageID 54
395

69

1    policy with a flat $1 million deductible.

2          So there are proximate cause issues for the

3    jury.  There are fact questions for the jury, and we

4    submit that their motion should be denied.  Thank you.

5          THE COURT:  Okay.

6          MR. DEAL:  Your Honor, may I be heard briefly

7    on a couple of issues?  Just as I suspected, Wakefern

8    would have attempted to lead the Court down into the

9    rabbit hole of breach.  Ms. Pastor argued for, you

10   know, they first two-thirds, basically, on the breach

11   issue and all the bad things that the brokers did to

12   breach their contract and there's a reason for that, as

13   I stated earlier, which is that they can't meet their

14   standard of proximate cause.  They keep talking about a

15   2013 policy that Aon was able to find ten months after

16   Sandy, point being, you know, saying -- to suggest it

17   was in the same timeframe as the marketing of the

18   policy at issue here is clearly disingenuous.

19         They keep trying to draw the Court and

20   everyone away from the fact that they don't have

21   evidence of a policy that was available in September,

22   2012, October 1, 2012, that would have paid more than

23   the $26 million that they got from this policy.

24         In terms of the merger claims, dismissal of

25   claims, whatever we want to call it, I think that the

MID L 006483-13    01/02/2019    Pg 72 of 84 Trans ID: LCV201950656
Case 2:23-cv-09047-JKS-AMD    Document 139-3    Filed 01/04/23    Page 71 of 83 PageID 55
396

70

1    problem that Wakefern is having here is they keep

2    assuming that our argument is that they are not allowed

3    to introduce evidence at trial of the client services

4    agreement, if the case only goes to the jury on

5    professional negligence.  That's not the argument that

6    we're making.  Certainly, the duties and

7    responsibilities that the brokers had under the two

8    different client services agreements will go before the

9    jury.

10          Our argument is simply that those all fall

11    within their standard duties of care.  They might have

12    done a little bit more than the corner broker or

13    whatever they're calling the, you know, some different

14    broker.  But that doesn't raise their standard of care

15    anything more.

16          There will be at trial -- there will be an

17    issue of whether there's a special duty or

18    relationship.  They'll have the ability to argue that

19    that contract raises an issue of a special duty or

20    relationship.  But what we're suggesting is that it's

21    still the same duty whether it's under professional

22    negligence, negligence, breach of fiduciary, breach of

23    contract, and that the issue should only go to the jury

24    on what.

25          In terms of the damages issue, again, it's a

1  contract interpretation of the policy.  Certainly,

2  there's case law that suggests that they're limited to

3  what they would have gotten under the policy and that's

4  why we make the argument that we made.

5        THE COURT:  Okay.  All right.  Again, I

6  appreciate your Counsel -- all Counsel enlightening me

7  on some of the things that I may have said that were

8  too general.  But in this -- in considering the

9  defendant's motion, the defendant contends that there's

10 no evidence, no proofs proffered by plaintiff to

11 indicate that any alleged breach by defendants

12 proximately caused damages because they have not

13 presented evidence that there was a better policy

14 available than the Lexington policy.

15        And so what do we -- what do we have here

16 that's a little different from these other matters?

17 The -- it's not only another policy that's at issue

18 here but it's were they deprived of the opportunity to

19 consider other options?  Did they perform in such a way

20 that the plaintiff contends that it will be able to

21 provide evidence, that there were other products did

22 not have a two percent named deductible.  Maybe they

23 can, maybe they can't.  That's for the trial Judge to

24 decide, not me.

25        Proximate cause, generally, is a jury

MID L 006483-13    01/02/2019    Pg 74 of 84 Trans ID: LCV201950656
Case 2:23-cv-09304-JKS-AMD   Document 139-3   Filed 01/24/24   Page 73 of 83 PageID: 57
398

72

1    decision, not a Judge decision.  I can't sit her and

2    talk about specifics, that there was a Zurich policy.

3    If there was a Zurich policy in 2012, was -- did they

4    have any different policy in 2011?  I don't know.

5    Perhaps, there's a witness who can answer that

6    question, this Aon.  I don't know.

7            But that's -- this is -- here's what the

8    problem, I think, is on the argument (indiscernible)

9    defendant, that they're arguing that there's a bright

10   line between finding a breach of the duty of

11   professional conduct, in this case, of a broker, or

12   even a special relationship and, certainly, that's a

13   primary issue in this case because one of the cases

14   cited was TRIARSI V. BSC GROUP, 422 New Jersey Super.

15   104.

16           There's -- a special relationship is defined

17   as being where the insurance agent "assumed duties in

18   addition to those normally associated with the agent

19   insured relationship.  And the -- these cases allude to

20   in special relationship and proximate cause, a case

21   decided in 1984 by the Appellate Division, SOBOTOR V.

22   PRUDENTIAL PROPERTY AND CASUALTY, and acts of omission

23   may give rise to a violation of duty of care.

24           Here's what the Court found in that case.

25   The Appellate Division found -- the Court found that

1    the broker held a "special relationship" to the

2    individual insured, who was unsophisticated in auto

3    insurance policies and relied on a broker's expertise

4    as to determine whether a non-driver was covered under

5    their policy.

6            Discussion included the length of the insured

7    broker's relationship to consider all surrounding facts

8    to determine whether the client, regardless of its size

9    and sophistication and the acts of omission may give

10   rise -- that acts of omission may give rise to a

11   violation of the duty of care.

12           So what do we have here?  We have a long-term

13   relationship.  We have insurance broker -- and, again,

14   I'm not saying that these insurer broker client service

15   agreements from Associated and BWD are any different

16   from a -- well, let's take -- let's take New Jersey.

17   Let's take one of my former clients, Barnabas Health.

18   They have an insurance broker, I'm sure, maybe more

19   than one, I don't know.  I haven't represented them

20   since 1996.  So I guarantee you, with a healthcare

21   provider, their broker agreement is probably ten times

22   the length of this but no more detailed than these, no

23   more detailed.

24           These give very clear and specific guarantees

25   to the plaintiff, not of we're going to guarantee you

1    we're going to do something in your favor but

2    guarantees that you can rely on us because we know you.

3    We can give you beyond just evaluating policies, which

4    are numbers.  We're going to tell you.  We going to

5    have lawyers who will analyze these policies, 4E of

6    both of them.

7         We're going to look at selected markets,

8    technical assistance.  We're going to provide Wakefern

9    Section F, all quotations received from the markets,

10   along with the detailed recommendations, which they

11   offer the best coverage, again, Associated Agencies'

12   professional expertise will be provided memorializing

13   issues such as the scope of the policies, coverage

14   pricing, carries the ability to properly adjust claims,

15   the next endorsements, et cetera.

16        And so does BWD.  There's a significant

17   factual issue whether or not these very specific long-

18   term relationships, that's a factor which is probably

19   one of the most important factors that our Courts have

20   used to determine whether or not there was a special

21   relationship between the parties.

22        Next, in -- Counsel for defendant is correct.

23   Many of these cases arise out of a relationship of --

24   I'm sorry -- a claim of professional negligence by

25   attorneys.  So in PORTAS V. TAN, -- PORTAS V. TAN is --

1    I believe it was later published.  So PORTAS V. TAN is

2    an Appellate Division decision from 2014 and it talks

3    about usually breach of contract terms are subsumed not

4    the professional negligence claim unless, for example,

5    the attorney breached a specific provision of the

6    retainer agreement.

7             Well, here, we have -- and then LEVINSON V.

8    D'ALFONSO AND STEIN, 320 New Jersey Super. 312 (1999)

9    Appellate Division.  There was a retainer agreement,

10   which provided that the -- the insurer would not settle

11   without the client's consent and while the Court said

12   that you can't -- you must guard against routinely

13   allowing a plaintiff to use a breach of contract claim

14   to hedge against possible dismissal of the malpractice

15   claims, this is not that case.

16            This is a case where there are -- is a long-

17   term relationship specific tasks undertaken by these

18   two brokers for this specific client, the industry, the

19   fact that it is -- has a -- it is an accumulation of

20   individual owners, it's not just a monolithic company

21   who have various issues.  They know they're going to

22   have to go before an insurance committee and defend.

23   Whether or not the -- these are all contract terms.

24            Was there another policy?  Well, the

25   plaintiff can't prove a negative.  They weren't given a

MID L 006483-13     01/02/2019     Pg 78 of 84 Trans ID: LCV201950656
Case 2:23-cv-19304-KMS-AMD   Document 139-3   Filed 01/04/23 Page 77 of 83 PageID 61
402

76

1    panoply of policies to look at.  They don't have

2    someone having said, here's the two percent and it's

3    going to cost you, if there is a named storm, untold

4    millions of dollars, if there's a named storm.

5    Remember, that named storm, yes, we had a big storm in

6    2011 but -- and they had Katrina down south, but we

7    haven't had a named storm so destructive.  We haven't

8    had a Sandy yet in New Jersey.  It's the hundred year

9    storm.  That's minimal as opposed to the savings we're

10   going to give you in the premium.  They didn't give the

11   opportunity of the plaintiff to have that opportunity

12   to compare.

13         They -- there are questions of fact.  It is

14   replete as to whether or not had they done a more --

15   knowing that there's a two percent total insured value

16   deductible, what did they do to find out whether or not

17   there were other policies -- and, again, the policy

18   that was presented to them that would have been a

19   renewal with the increased 27 percent premium, hundred

20   thousand deductible, all of that, there's a question

21   that that had a named storm deductible.  Probably not.

22         But all of this raises -- raises issues.

23   There's a -- just like the retainer agreement, this

24   isn't just we're going to do specialized services as

25   brokers under the general theory that we have a

MID L 006483-13    01/02/2019     Pg 79 of 84 Trans ID: LCV201950656
Case 2:23-cv-19304-KM-AMD   Document 139-3   Filed 01/24/23   Page 78 of 83 PageID 62
403

77

1    fiduciary responsibility to you under N.J.A.C. 11:17A-

2    4.10, an insurance producer acts in a fiduciary

3    capacity in the conduct of his or her insurance

4    business.

5            Well, if that's all there is, yes, I probably

6    would -- if that's all there was, I might have some

7    reason to listen to the defense.  But this isn't that.

8    This is a contract.  The jury is going to have two

9    contracts in front of it.  They're going to be walked

10   through those contracts point by point.  They're going

11   to have to determine whether or not those contracts

12   gave their -- elevated their professional conduct to a

13   standard not of a regular insurance broker but a

14   special relationship broker and whether or not they

15   breached that duty.

16           I mean, essentially, of course, probably the

17   jury question is going to be, did they -- did they --

18   did they breach their duty of -- based upon industry

19   standards as an insurance broker and it's not broken

20   down into the -- if I said that's -- it's not the

21   standard with the special relationship broker, it's the

22   standard of a broker.

23           But then there are contract issues that go

24   into the special relationship.  They're much more

25   distinct than the -- than the -- than the general

1    negligence, professional negligence claims and the

2    professional negligence claims, I find that there are

3    certainly factual issues as to whether or not the --

4    they were told about the consequences of the two

5    percent named deductible.

6             While it's outside the scope of what was

7    submitted here but I'm a homeowner.  Any homeowner who

8    owns a home along the Jersey shore, about at least a

9    half a million of us, whoever we have insurance

10   through, when we got our renewal, the insurance

11   companies tell us, hey, by the way, named storm, two

12   percent, three percent, four percent, five percent,

13   depending where you are and, in addition, they tell you

14   when they give you your questionnaire to decide whether

15   you're going to buy a policy for the next year, and

16   they tell you, and in your case, your house is valued

17   at a half a million dollars, a million dollars.  Your

18   three percent is worth $30,000.  Your three percent is

19   worth $15,000.  Whatever it is, they tell you that.

20            So plaintiffs are saying, we were deprived of

21   that.  It's both a contract issue and a professional

22   negligence issue.  They're inseparable.

23            So as to the plaintiff's motion, -- and

24   proximate cause, certainly consequences flow from if

25   they didn't inform -- properly inform the plaintiff of

MID L 006483-13    01/02/2019    Pg 81 of 84 Trans ID: LCV201950656
Case 2:23-cv-19304-KMS-AMD   Document 139-3   Filed 01/24/23 Page 80 of 83 PageID64
405

79

1    its additional exposure under the two percent total

2    insured value, there are many -- many disputed facts,

3    which would indicate whether or not by omitting it,

4    they deprived the plaintiff for an opportunity to look

5    for those policies, which didn't have a two percent.  I

6    don't think the FM did but then, again, that's a breach

7    -- that's something that the -- that the jury will have

8    to determine.

9         So I'm denying the motion to dismiss the

10   professional negligence claim for lack of proximate

11   cause.  I find that there are serious issues of fact

12   there.  The motion to subsume the breach of contract,

13   negligence, and fiduciary claims, they're distinct.

14   That's denied.  And as to the -- as to the cap, I agree

15   with plaintiff.  If they breached their duty and caused

16   a loss, it's up to the jury to determine that loss and

17   the jury is not constrained by any cap on the Lexington

18   policy.

19        The Lexington policy is the contract that

20   plaintiff claims it wouldn't have taken had it known

21   about other options and that policy doesn't control.

22   It's the standard determination of what consequences

23   flowed from anything that defendants are found to have

24   done wrong and, again, a jury -- again, there are facts

25   at issue here.  I'm not saying a jury is going to --

1  I'm not granting the plaintiff's summary judgment.  You

2  know, plaintiff has some serious issues that it's going

3  to have to confront and prove in order to sustain its

4  claim of professional negligence.  But that's -- again,

5  that's why we have jury trials.

6           I find that there are -- there's no --

7  nothing within the contracts, which are the client

8  services agreements between the defendants and the

9  plaintiffs, which in any way refer to a cap on damages

10  for breach of those agreements and, therefore, that

11  motion is also denied.  Okay.

12           MS. PASTOR:  Thank you, Your Honor.

13           MR. DEAL:  Thank you, Your Honor.

14           THE COURT:  Okay.  Now, let's see.  I'm

15  trying to find the -- my law clerk did not highlight

16  the -- well, I'll find the orders -- I have the orders

17  in the other matter, but I'll find the orders in this

18  case.  Okay.  Thank you, again, and I appreciate your

19  efforts that went into this and you made my job a lot

20  easier.

21           MS. PASTOR:  Thank you, Your Honor.

22           MS. HENRICH:  Thank you, Your Honor.

23           MS. PASTOR:  Your Honor, would you mind if I

24  asked a logistical question?

25           THE COURT:  Sure.

 1           MS. PASTOR:  We have a trial date coming up

 2    and I was wondering if Your Honor is our trial Judge

 3    and this is our room.

 4           THE COURT:  No.  You're not -- I'm not your

 5    trial Judge.  I can tell you that.

 6           MS. PASTOR:  Okay.  All right.  And so, I

 7    guess, we don't know what room we have either.  I'm

 8    thinking --

 9           THE COURT:  Yes.  I don't know who you're

10    having either.  I won't be here.  As I said, I'm on

11    recall and I -- I get -- I get most of the month of

12    August off and, July, I have to cover Special Civil for

13    three weeks.  That's my -- that's my other assignment.

14    So between all of that, I couldn't do a jury trial of

15    this magnitude.  I wish I could.  It would be fun, but

16    I can't.  Have a good day, everybody.

17           MS. PASTOR:  Thank you.  Enjoy your summer.

18           MS. HENRICH:  Thank you, Your Honor.

19           THE COURT:  Thank you.

20                  (Proceedings concluded)

21

22

23

24

25

82

1                          CERTIFICATION

2

3       I, SHERRY M. BACHMANN, the assigned transcriber, do

4       hereby certify the foregoing transcript of

5       proceedings, time from 9:53 a.m. to 11:56 a.m., is

6       prepared in full compliance with the current

7       Transcript Format for Judicial Proceedings and is a

8       true and accurate non-compressed transcript of the

9       proceedings as recorded.

10

11

12      *Sherry Bachmann*

13      _____

14      SHERRY M. BACHMANN   AOC #454
        G&L TRANSCRIPTION OF NJ          Date:   July 2, 2018
15

16

17

18

19

20

21

22

23

24

25